1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  ANTHONY R. HAKL, STATE BAR NO. 197335
   Supervising Deputy Attorney General
3  DAVID GREEN, State Bar No. 287176
   Deputy Attorney General
4    1300 I Street, Suite 125
     Sacramento, CA 95814
5    Telephone: (916) 210-6242
     Fax: (916) 324-8835
6    E-mail: David.Green@doj.ca.gov
   *Attorneys for Defendants*

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12 | **PROFESSIONAL COMPOUNDING CENTERS OF AMERICA, INC.,** | Case No. 2:25-cv-02799-JAM-CSK |

13 | Plaintiff, | **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION TO DISMISS** |

14 | v. |

15 | | Date:    January 6, 2026 |
16 | **ANNE SODERGREN, Executive Officer of the California State Board of Pharmacy, JULIE ANSEL, Deputy Executive Officer of the California State** | Time:    1:00 p.m. |
   | | Dept.:    6 |
17 | **Board of Pharmacy, SEUNG OH, President of the California State Board of Pharmacy, JESSICA** | Judge:    The Honorable John A. Mendez |
18 | **CROWLEY, Vice President of the California State Board of Pharmacy, TREVOR CHANDLER,** |
19 | **Treasurer of the California State Board of Pharmacy, RENEE ARMENDARIZ, Member of the** |
20 | **California State Board of Pharmacy, KARTIKEYA JHA, Board Member of the California State Board** |
21 | **of Pharmacy, SATINDER SANDHU, Member of the California State Board of Pharmacy, MARIA D.** |
22 | **SERPA, Member of the California State Board of Pharmacy, NICOLE THIBEAU, Member of the** |
23 | **California State Board of Pharmacy, JEANETTE DONG, Member of the California State Board of** |
24 | **Pharmacy, JEFF HUGHES, Member of the California State Board of Pharmacy, CLAUDIA L.** |
25 | **MERCADO, Member of the California State Board of Pharmacy, JASON NEWELL, Member of the** |
26 | **California State Board of Pharmacy, and RICARDO SANCHEZ, Member of the California State Board of** |
27 | **Pharmacy, all in their official capacities,** |
28 | Defendants. |

1    Under Federal Rule of Evidence 201, Defendants respectfully request that the Court take

2    judicial notice of the following documents in support of their motion to dismiss:

3        1. Exhibit 1:  The regulation formerly codified at Cal. Code Regs. tit. 16, § 1735.3

4        between January 1, 2017 and October 1, 2025.

5        2. Exhibit 2:  An FDA alert titled "FDA to Compounders: Know Your Bulks and

6        Excipients Suppliers," available at https://www.fda.gov/drugs/human-drug-

7        compounding/fda-compounders-know-your-bulks-and-excipients-suppliers.

8        3. Exhibit 3:  An FDA Warning Letter issued on June 4, 2019, available at

9        https://www.fda.gov/inspections-compliance-enforcement-and-criminal-

10        investigations/warning-letters/spectrum-laboratory-products-573311-06042019.

11        4. Exhibit 4:  An FDA Warning Letter issued on July 31, 2019, available at

12        https://www.fda.gov/inspections-compliance-enforcement-and-criminal-

13        investigations/warning-letters/spectrum-laboratory-products-inc-579958-07312019.

14        5. Exhibit 5:  An FDA Warning Letter issued on October 28, 2019, available at

15        https://www.fda.gov/inspections-compliance-enforcement-and-criminal-

16        investigations/warning-letters/yino-inc-578566-

17        10282019#:~:text=You%20re%2Dlabel%20active%20pharmaceutical,(b)(4)%20API.

18        6. Exhibit 6:  An FDA policy titled "Interim Policy on Compounding Using Bulk Drug

19        Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act Guidance

20        for Industry," available at https://www.fda.gov/media/94402/download.

21    The Court may take judicial notice of any fact that is "not subject to reasonable dispute

22    because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be

23    accurately and readily determined from sources whose accuracy cannot reasonably be

24    questioned."  Fed. R. Evid. 201(b).  *See, e.g.*, *Navajo Nation v. Dep't of the Interior*, 876 F.3d

25    1144, 1153 n.3 (9th Cir. 2017); *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 824

26    n.3 (9th Cir. 2011).  Relevant here, a court may take judicial notice of former regulations.  *See,*

27    *e.g.*, *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1153 n.3 (9th Cir. 2017); *Campbell v.*

28    *PricewaterhouseCoopers, LLP*, 642 F.3d 820, 824 n.3 (9th Cir. 2011).  A court may also, more

broadly, take judicial notice of official government guidance documents and other government publications. *See, e.g., Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1030 n.2 (9th Cir. 2024); *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1051 n.1 (9th Cir. 2022); *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016) (noting that "courts routinely take judicial notice of letters published by the government").

The documents listed above are judicially noticeable under this precedent. Because the accuracy of these records cannot reasonably be questioned, judicial notice of these records is appropriate. *See* Fed. R. Evid. 201(c)(2) (a court "must take judicial notice if a party requests it and the court is supplied with the necessary information").

Dated:  November 25, 2025                    Respectfully submitted,

                                             ROB BONTA
                                             Attorney General of California
                                             ANTHONY R. HAKL
                                             Supervising Deputy Attorney General


                                             */s/ David Green*
                                             DAVID GREEN
                                             Deputy Attorney General
                                             *Attorneys for Defendants*

2

# Exhibit 1

| Barclays California Code of Regulations |
| Title 16. Professional and Vocational Regulations |
| Division 17. California State Board of Pharmacy (Refs & Annos) |
| Article 4.5. Compounding |

This section has been updated. Click here for the updated version.

16 CCR § 1735.3

§ 1735.3. Recordkeeping for Compounded Drug Preparations.

(a) For each compounded drug preparation, pharmacy records shall include:

  (1) The master formula document.

  (2) A compounding log consisting of a single document containing all of the following:

    (A) Name and Strength of the compounded drug preparation.

    (B) The date the drug preparation was compounded.

    (C) The identity of any pharmacy personnel engaged in compounding the drug preparation.

    (D) The identity of the pharmacist reviewing the final drug preparation.

    (E) The quantity of each ingredient used in compounding the drug preparation.

    (F) The manufacturer, expiration date and lot number of each component. If the manufacturer name is demonstrably unavailable, the name of the supplier may be substituted. If the manufacturer does not supply an expiration date for any component, the records shall include the date of receipt of the component in the pharmacy, and the limitations of section 1735.2, subdivision (*l*) shall apply.

(i) Exempt from the requirements in this paragraph (1735.3(a)(2)(F)) are sterile preparations compounded in a single lot for administration within seventy-two (72) hours to a patient in a health care facility licensed under section 1250 of the Health and Safety Code and stored in accordance with standards for "Redispensed CSPs" found in Chapter 797 of the United States Pharmacopeia -- National Formulary (USP37-NF32) Through 2nd Supplement (37th Revision, Effective December 1, 2014), hereby incorporated by reference.

(G) A pharmacy-assigned unique reference or lot number for the compounded drug preparation.

(H) The beyond use date or beyond use date and time of the final compounded drug preparation, expressed in the compounding document in a standard date and time format.

(I) The final quantity or amount of drug preparation compounded for dispensing.

(J) Documentation of quality reviews and required post-compounding process and procedures.

(b) Pharmacies shall maintain records of the proper acquisition, storage, and destruction of chemicals, bulk drug substances, drug products, and components used in compounding.

(c) Active ingredients shall be obtained from a supplier registered with the Food and Drug Administration (FDA). All other chemicals, bulk drug substances, and drug products used to compound drug preparations shall be obtained, whenever possible, from FDA- registered suppliers. The pharmacy shall acquire and retain certificates of purity or analysis, either written in English or translated into English, for chemicals, bulk drug substances, and drug products used in compounding. Certificates of purity or analysis are not required for drug products that are approved by the FDA. Any certificates of purity or analysis acquired by the pharmacy shall be matched to the corresponding chemical, bulk drug substance, or drug products received.

(d) Pharmacies shall maintain and retain all records required by this article in the pharmacy in a readily retrievable form for at least three years from the date the record was last in effect. If only recorded and stored electronically, on magnetic media, or in any other computerized form, the records shall be maintained as specified by Business and Professions Code section 4070 subsection (c).

**Credits**

NOTE: Authority cited: Sections 4005, 4127 and 4169, Business and Professions Code. Reference: Sections 4005, 4036, 4037, 4051, 4052 and 4127, Business and Professions Code.

HISTORY

§ 1735.3. Recordkeeping for Compounded Drug Preparations., 16 CA ADC § 1735.3

1. New section filed 1-6-2010; operative 7-6-2010 (Register 2010, No. 2).

2. Amendment of subsection (a)(6), repealer of former subsection (a)(7) and subsection renumbering filed 2-6-2013; operative 4-1-2013 (Register 2013, No. 6).

3. Amendment of section heading and section filed 9-13-2016; operative 1-1-2017 (Register 2016, No. 38).

Cal. Admin. Code tit. 16, § 1735.3, 16 CA ADC § 1735.3

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

# FDA to Compounders: Know Your Bulks and Excipients Suppliers

## Quality Matters Related to Components of a Drug

FDA continues to identify several issues related to repackagers of bulk drug substances, also called active pharmaceutical ingredients (APIs), and excipients used to compound drugs that have resulted in patient harm.

The agency urges compounders to know your bulk drug substance, or API, and excipient suppliers and know if the supplier is testing the component to ensure it is of appropriate quality to use in drugs. The quality of bulk drug substances and excipients can affect the quality of compounded drugs.

### FDA Urges Compounders to:

- know your bulk drug substance and excipient suppliers
- know the quality of the materials you get from your suppliers, including what testing the supplier does to determine the quality of the components you purchase
- meet the conditions regarding bulk drug substances in sections 503A and 503B of the Federal Food, Drug and Cosmetic Act, including:
  - API compliance with applicable United States Pharmacopeia (USP) or National Formulary (NF) monograph standars
  - sourcing API from FDA-registered facilities
  - valid certificates of analysis
  - excipient compliance with applicable USP or NF monograph standards

### Repackagers should:

- ask compounders how they intend to use the ingredient to help ensure the ingredient is appropriate for use in a drug
- follow all quality standards pertaining to API you repackage
- ensure you have sufficient supply chain transparency to mitigate risks to patients
- clearly identify the original API manufacturer to customers who use them to make the finished drugs

- report quality problems to FDA

- do not have false or misleading labels regarding the identity of the manufacturer of the component you are selling (21 CFR 201.1(h)(2))

# Examples of Quality Issues with Bulk Drug Substances and Excipients

**The agency has issued alerts regarding several quality issues:**

- dietary ingredient nicotinamide adenine dinucleotide (NAD+) (/drugs/human-drug-compounding/fda-reminds-compounders-use-ingredients-suitable-sterile-compounding)

- dietary ingredient glutathione  (/drugs/human-drug-compounding/fda-highlights-concerns-using-dietary-ingredient-glutathione-compound-sterile-injectables)

- curcumin emulsion (/drugs/human-drug-compounding/fda-investigates-two-serious-adverse-events-associated-imprimisrxs-compounded-curcumin-emulsion) found to contain diethylene glycol (DEG) toxin

Additionally, Darmerica (/safety/recalls-market-withdrawals-safety-alerts/darmerica-llc-issues-voluntary-nationwide-recall-quinacrine-dihydrochloride-due-labeling-error) recalled bulk API, which shipped API labeled as quinacrine dihydrochloride to compounders nationwide, but subsequent tests identified the API as artemisinin.

## FDA Oversight

**The agency remains vigilant in our inspections and oversight of the supply chain. We inspect API manufacturers, including repackagers, to help identify and prevent any weaknesses in the drug supply chain. FDA has:**

- issued warning letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters) to API manufacturers, including repackagers, for significant violations of current good manufacturing practice (CGMP) requirements

- placed API repackagers on import alert (https://www.accessdata.fda.gov/cms_ia/importalert_189.html) to help stop their API from entering the U.S. This action helps stop their products from entering the U.S. supply chain.

# Resources for Compounders and Excipient Suppliers

- The guidance for industry, <u>Testing of Glycerin, Propylene Glycol, Maltitol Solution, Hydrogenated Starch Hydrolysate, Sorbitol Solution, and Other High-Risk Drug Components for Diethylene Glycol and Ethylene Glycol (/regulatory-information/search-fda-guidance-documents/testing-glycerin-propylene-glycol-maltitol-solution-hydrogenated-starch-hydrolysate-sorbitol)</u>, provides recommendations that assist compounders, pharmaceutical manufacturers, repackagers and other suppliers of glycerin, propylene glycol, maltitol solution, hydrogenated starch hydrolysate, sorbitol solution and other high-risk drug components, to establish practices that prevent the use of drug components that are contaminated with DEG or EG.

- The guidance for industry, <u>Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients (/media/71518/download?attachment)</u> contains information on how API, from original manufacturers and API repackagers and relabelers, should identify the original API manufacturer to assure transparency as the API moves through the supply chain. The guidance for industry, Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients, Questions and Answers is intended to respond to requests for clarification about the Q7 Guidance.

- There are several United States Pharmacopeia (USP) monographs, including monographs for glycerin, propylene glycol, sorbitol solution, noncrystallizing sorbitol solution, sorbitol sorbitan solution and maltitol solution, that incorporate identity testing provisions for DEG and EG. Information on these and other pharmaceutical excipients at risk for DEG and EG contamination, including appropriate test methods and DEG and EG limits, appears in the applicable USP monographs.

## How Compounders Use Bulk Drug Substances and Excipients

Generally, repackagers take bulk API (usually in powder form) or excipients from the container in which the API or excipient was distributed by the original manufacturer and place it into a different container without further manipulation of the API or excipient, for distribution to drug manufacturers, such as compounders. Improper repackaging or lack of supply chain transparency regarding API or excipients can cause serious vulnerabilities in the supply chain and may lead to patient safety issues.

# Report a Problem to FDA

We encourage compounders, health care professionals and patients to report adverse events or quality problems associated with compounded drug products, including adverse events that may be linked to API or excipients that may have been contaminated, to <u>FDA's MedWatch Adverse</u>

Case 2:25-cv-02799-JAM-CSK    Document 33-2    Filed 11/25/25    Page 12 of 46

Event Reporting program (http://www.fda.gov/Safety/MedWatch/default.htm).

- Complete and submit the report online at www.fda.gov/MedWatch/report (https://www.accessdata.fda.gov/scripts/medwatch/index.cfm?action=reporting.home)

- Download form (/media/76299/download?attachment) or call 1-800-332-1088 to request a reporting form, then complete and return to the address on the pre-addressed form, or submit by fax to 1-800-FDA-0178



Was this page helpful? * (required)

Yes

No

**Submit**

🇺🇸 An official form of the United States government. Provided by Touchpoints

# Exhibit 3

Case 2:25-cv-02799-JAM-CSK     Document 33-2     Filed 11/25/25     Page 14 of 46

**WARNING LETTER**

# Spectrum Laboratory Products

**MARCS-CMS 573311 — JUNE 04, 2019**

> ⊕ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**Delivery Method:**

VIA SIGNATURE CONFIRMED DELIVE

**Product:**

Drugs

**Recipient:**

Mr. Randy Burg

President/CEO

Spectrum Laboratory Products

14422 S. San Pedro Street
Gardena, CA 90248
United States

**Issuing Office:**

Division of Pharmaceutical Quality Operations IV

19701 Fairchild

Irvine, CA 92612-2506
United States

**WARNING LETTER**

**VIA UPS SIGNATURE CONFIRMED DELIVERY**

June 4, 2019

Mr. Randy Burg
President/CEO
Spectrum Laboratory Products, Inc.
14422 S. San Pedro Street
Gardena, CA 90248

Dear Mr. Burg:

The U.S. Food and Drug Administration (FDA) inspected your drug manufacturing facility, Spectrum Laboratory Products, Inc. (Spectrum), FEI 2020632, at 14422 South San Pedro Street, Gardena, California, from November 8 to 16, 2018.

Case 2:25-cv-02799-JAM-CSK     Document 33-2     Filed 11/25/25     Page 15 of 46

This warning letter summarizes significant deviations from current good manufacturing practice (CGMP) for active pharmaceutical ingredients (API).

Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your drugs are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B).

In addition, your firm commercially distributes acetylcysteine, doxylamine, pyrimethamine, tamoxifen, and trichlormethiazide. A review of FDA's drug listing database confirms that these drugs are currently not listed with FDA as required by section 510 of the FD&C Act, 21 U.S.C. 360(j), which is prohibited under section 301(p) of the FD&C Act, 21 U.S.C. 331(p). Failure to properly list a drug with the FDA will also render it misbranded under section 502(o) of the FD&C Act, 21 U.S.C. 352(o).

In addition, your fentanyl citrate, hydrocodone bitartrate, buprenorphine hydrochloride, hydromorphone hydrochloride, morphine sulfate, and nalbuphine hydrochloride API are misbranded under sections 502(a) of the FD&C Act, 21 U.S.C. 352(a).

We reviewed your December 10, 2018, response in detail and acknowledge receipt of your subsequent correspondence.

During our inspection, our investigators observed specific deviations including, but not limited to, the following.

**CGMP Charges**

**1. Failure to transfer all quality or regulatory information received from the API manufacturer to your customers.**

You omitted the names and addresses of the original manufacturers of your repackaged API on certificates of analysis (COA) you issued to your customers. For example, you omitted the manufacturer information on your COA or your label for opioid API fentanyl citrate, USP and morphine sulfate, USP. You distributed these opioid API with incomplete information to your customers, including compounding pharmacies.

In your response, you asserted that your current practice is sufficient. Your response is inadequate in that you do not commit to ensure that your COA contain information about the original manufacturer.

Customers and regulators rely on COA for information about the quality and source of drugs and their components. Omitting information from the COA compromises supply chain accountability and traceability, and may put consumers at risk.

See Guidance for Industry: Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients and Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients—Questions and Answers for more information on how API, from original manufacturers as well as API repackagers and relabelers, should be labeled and should clearly identify the original API manufacturer as the API moves through the supply chain. The guidance can be found at: https://www.fda.gov/media/71518/download and https://www.fda.gov/media/112426/download.

In response to this letter, provide the following:
? a remediated program for generating COA, including systems and procedures to assure that COA issued by your firm include necessary original manufacturer information;
? a retrospective review to determine how your failure to provide required information may have affected drug quality, and indicate any actions you have taken or will take, such as notifying customers, or invalidating previously issued COA for any drugs still within their labeled retest dates; and
? examples of recently-issued COA that include specific information regarding the original manufacturer, including a copy of their original batch certificate.

**2. Failure of your quality unit to ensure that critical deviations are investigated and resolved.**

You failed to perform and document adequate investigations to determine root cause and identify a corrective action. For example, you failed to thoroughly investigate a cracked bottle of repackaged Buprenorphine HCl (Lot #1HH0338). During the inspection, your employee stated the Hazardous Material Incident Report, which did not include a root cause determination and corrective action, was the only document available for this deviation.

In your response, you stated that you investigated the container defect, including other drugs that may be impacted by this issue. However, you failed to provide copies of documents to support your conclusion. For example, you did not provide a copy of the batch record for the 2-dram bottle Item **(b)(4)** Lot **(b)(4)** which you stated contained the full investigation.

In addition, while you noted your Hazardous Material Incident Report form was revised to include a "notes field," you did not include a copy of the form with your response or explain how this revision will ensure adequate investigations into product quality issues going forward.

You also failed to thoroughly investigate customer complaints. For example, you failed to identify a root cause for a customer complaint that noted batch variation and potential quality defects for fluconazole, USP. Your Complaint Report for complaint #PC58672 lacked a comprehensive investigation into the root cause for this batch and a proposed corrective action. Also, you did not extend your investigation to other batches that may have been associated with this specific deviation.

In your response, you stated the root cause analysis and corrective action are available in the full complaint records. However, you failed to provide copies of the records to support your response.

In response to this letter, provide the following:
? the full reports for the root cause investigations performed; and
? a comprehensive assessment of your system for investigating deviations, atypical events, and complaints. Your corrective action and preventive action (CAPA) plan should include, but not be limited to, improvements in investigations, root cause analysis, written procedures, and quality unit oversight.

### Concerns Regarding Glycerin

Your product list collected during the inspection, which is also available on your website, included the drug glycerin. The use of glycerin contaminated with diethylene glycol (DEG) has resulted in various lethal poisoning incidents in humans worldwide. See FDA's guidance document, Testing of Glycerin for Diethylene Glycol, to help you meet CGMP requirements when distributing glycerin for use in drug products, including testing for DEG and recommendations for supply chain integrity, at https://www.fda.gov/media/71029/download.

### CGMP Consultant Recommended

Based upon the nature of the deviations we identified at your firm, we strongly recommend engaging a consultant qualified to evaluate your operations to assist your firm in meeting CGMP requirements.

Your use of a consultant does not relieve your firm's obligation to comply with CGMP. Your firm's executive management remains responsible for resolving all deficiencies and systemic flaws to ensure ongoing CGMP compliance.

### Drug Listing Violation

According to the sales record obtained at the time of inspection, Spectrum Laboratory Products Inc. (FEI 2020632) manufactures drugs for commercial distribution in the United States, of which some have not been listed with FDA as required by the law. These drugs include acetylcysteine, doxylamine, pyrimethamine, tamoxifen, and trichlormethiazide. Under section 510 of the FD&C Act, as amended, and 21 CFR, all drugs manufactured, prepared, propagated,

compounded or processed for U.S. commercial distribution must be listed with FDA. See 21 U.S.C. 360(j)(1); see also 21 CFR 207.17 and 207.41. Failure to properly list a drug product is prohibited and will render the drug misbranded. See 21 U.S.C. 331(p) and 352(o).

**Misbranding Violations**

The fentanyl citrate, hydrocodone bitartrate, buprenorphine hydrochloride, hydromorphone hydrochloride, morphine sulfate, and nalbuphine hydrochloride API labels identify Spectrum but do not designate the firm's role. Since these API labels bear only Spectrum's name without further qualifications, the labels falsely represent that Spectrum is the sole drug manufacturer. (See 21 CFR 201.1(h)(2)). Therefore, the API are misbranded under section 502(a) of the FD&C Act because the labels are false and misleading.

**Conclusion**

Deviations cited in this letter are not intended as an all-inclusive list. You are responsible for investigating these deviations, for determining the causes, for preventing their recurrence, and for preventing other deviations.

If you are considering an action that is likely to lead to a disruption in the supply of drugs produced at your facility, FDA requests that you contact CDER's Drug Shortages Staff immediately, at drugshortages@fda.hhs.gov, so that FDA can work with you on the most effective way to bring your operations into compliance with the law. Contacting the Drug Shortages Staff also allows you to meet any obligations you may have to report discontinuances or interruptions in your drug manufacture under 21 U.S.C. 356C(b) and allows FDA to consider, as soon as possible, what actions, if any, may be needed to avoid shortages and protect the health of patients who depend on your products.

Correct the deviations cited in this letter promptly. Failure to promptly correct these deviations may result in legal action without further notice including, without limitation, seizure and injunction. Unresolved deviations in this warning letter may also prevent other Federal agencies from awarding contracts.

Until these deviations are corrected, we may withhold approval of pending drug applications listing your facility. We may re-inspect to verify that you have completed your corrective actions.

After you receive this letter, respond to this office in writing within 15 working days. Specify what you have done since our inspection to correct your deviations and to prevent their recurrence. If you cannot complete corrective actions within 15 working days, state your reasons for delay and your schedule for completion.

Please send your electronic reply to ORAPHARM4_Responses@FDA.HHS.GOV or mail your reply to:

CDR Steven E. Porter, Jr.
Director, Division of Pharmaceutical Quality Operations IV
U.S. Food & Drug Administration
19701 Fairchild Road
Irvine, California 92612-2506

Please identify your responses with the unique identifier: **CMS 573311**.

If you have questions regarding the contents of this letter, please contact Mariza Jafary, Compliance Officer via email at Mariza.Jafary@fda.hhs.gov or by telephone at 949-608-2977.

Sincerely,
/S/

Case 2:25-cv-02799-JAM-CSK    Document 33-2    Filed 11/25/25    Page 18 of 46

CDR Steven E. Porter, Jr.

Director, Division of Pharmaceutical Quality Operations IV

Was this page helpful? * (required)

Yes

No

**Submit**

🇺🇸 An official form of the United States government. Provided by Touchpoints

# Exhibit 4

**WARNING LETTER**

# Spectrum Laboratory Products, Inc.

**MARCS-CMS 579958 — JULY 31, 2019**

⊕ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

---

**Delivery Method:**

VIA UPS

**Product:**

Drugs

---

**Recipient:**

Mr. Randy Burg

President/CEO

Spectrum Laboratory Products, Inc.

14422 S. San Pedro Street
Gardena, CA 90248
United States

**Issuing Office:**

Division of Pharmaceutical Quality Operations I

10 Waterview Blvd, 3rd FL
Parsippany, NJ 07054
United States

---

**WARNING LETTER**

**CMS #579958**

07/31/2019

**VIA UPS OVERNIGHT**

Mr. Randy Burg
President/CEO
Spectrum Laboratory Products, Inc.
14422 S. San Pedro Street
Gardena, CA 90248

Dear Mr. Burg:

Case 2:25-cv-02799-JAM-CSK    Document 33-2    Filed 11/25/25    Page 21 of 46

The U.S. Food and Drug Administration (FDA) inspected your drug manufacturing facility, Spectrum Laboratory Products, Inc., FEI 2246824, at 755, 769, and 777 Jersey Avenue, New Brunswick, New Jersey, from February 19, 2019 to March 12, 2019.

This warning letter summarizes significant deviations from current good manufacturing practice (CGMP) for active pharmaceutical ingredients (API).

Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your API are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B).

Your firm repackages and relabels many drugs for commercial distribution in the United States. A review of FDA's drug listing database confirms that some of these drugs are not currently listed with FDA as required by section 510 of the FD&C Act, 21 U.S.C. 360(j)), which is
prohibited under section 301(p) of the FD&C Act, 21 U.S.C. 331(p)). Failure to properly list a drug with the FDA will also render it misbranded under section 502(o) of the FD&C Act, 21 U.S.C. 352(o)).

In addition, your potassium bicarbonate, sodium bicarbonate, progesterone, ferric subsulfate solution and tobramycin sulfate API are misbranded under sections 502(a) of the FD&C Act, 21 U.S.C. 352(a).

We reviewed your April 1, 2019, response to our Form FDA 483 in detail and acknowledge receipt of your subsequent correspondence.

During our inspection, our investigator observed specific deviations including, but not limited to, the following.

**1. Failure to transfer all quality or regulatory information received from the API manufacturer to your customers and to reference the original manufacturer on your certificates of analysis.**

You omitted the names and addresses of the original manufacturers of your repackaged API on certificates of analysis (COA) you issued to your customers. For example, you omitted the manufacturer information on your COA or labels for potassium bicarbonate USP, sodium
bicarbonate USP, progesterone (micronized powder) USP, and ferric subsulfate solution, USP. You distributed these API with incomplete information to your customers, including compounding pharmacies.

In your response, you asserted that your current practice is sufficient. Your response stated you maintain traceability and your customers can request information regarding the original manufacturer if they sign a non-disclosure agreement. However, your COA do not provide the
identity of the original manufacturer to your customers. Your response is inadequate in that you do not commit to ensure that your COA contain true and accurate information about the original manufacturer. Note, in your response to the FDA Warning Letter issued to your California Facility, you proposed **(b)(4)** on your COA instead of providing accurate information to your customers. The **(b)(4)** on the COA is not an acceptable method of providing the actual manufacturer's name and is not true and accurate information.

Customers and regulators rely on COA for information about the quality and source of drugs and their components. Omitting information from the COA compromises supply chain accountability and traceability, and may put consumers at risk.

See *Guidance for Industry: Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients and Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients—Questions and Answers* for more information on how API, from original manufacturers as well as API repackagers and relabelers, should be labeled and

Case 2:25-cv-03799-JAM-CSK    Document 33-2    Filed 11/25/25    Page 22 of 46

should clearly identify the original API manufacturer as the API moves through the supply chain. The guidance can be found at: https://www.fda.gov/media/71518/download and https://www.fda.gov/media/112426/download.

In response to this letter, provide the following:

? A remediated program for generating COA, including systems and procedures to assure that COA issued by your firm include necessary original manufacturer information.

? A retrospective review to determine how your failure to provide required information may have affected drug quality. Indicate any actions you have taken or will take, such as notifying customers, or invalidating previously issued COA for any drugs still within their labeled retest dates.

? Examples of recently-issued COA that include specific information regarding the original manufacturer, including a copy of their original batch certificate.

## Observations at Multiple Sites

FDA cited similar CGMP deviations at another facility in your company's network. We issued a warning letter to Spectrum Laboratory Products, Inc., FEI 2020632, in Gardena, California on June 4, 2019, citing similar CGMP deviations for lack of supply chain traceability. These failures at multiple sites demonstrate that management oversight and control over the manufacture of drugs are inadequate.

Your executive management remains responsible for fully resolving all deficiencies and ensuring ongoing CGMP compliance. You should immediately and comprehensively assess your company's global manufacturing operations to ensure that systems, processes, and the products manufactured conform to FDA requirements.

## CGMP Consultant Recommended

We acknowledge that you committed to using a consultant to assist in meeting FDA requirements.

Your use of a consultant does not relieve your firm's obligation to comply with CGMP. Your firm's executive management remains responsible for resolving all deficiencies and systemic flaws to ensure ongoing CGMP compliance.

## Concerns Regarding Glycerin

Your product list collected during the inspection, which is also available on your website, included the drug glycerin. The use of glycerin contaminated with diethylene glycol (DEG) has resulted in various lethal poisoning incidents in humans worldwide. See FDA's guidance document, *Testing of Glycerin for Diethylene Glycol*, to help you meet CGMP requirements when distributing glycerin for use in drug products, including testing for DEG and recommendations for supply chain integrity, including ensuring drug product manufacturers, such as you customers, know the true identity of the manufacturer of glycerin, at https://www.fda.gov/media/71029/download.

## Drug Listing Violation

According to the sales record obtained at the time of inspection, Spectrum Laboratory Products Inc., FEI 2246824, repackages and relabels drugs for commercial distribution in the United States, of which some have not been listed with FDA as required by the law.

Examples include bismuth subsalicylate, clobetasol propionate, and dextromethorphan hydrobromide. Under section 510 of the FD&C Act, as amended, and 21 CFR 207, all drugs manufactured, prepared, propagated, compounded, or processed for U.S. commercial distribution must be listed with the FDA. See 21 U.S.C. 360(j)(1); see also 21 CFR 207.17 and 207.41.

Case 2:25-cv-02799-JAM-CSK   Document 36-2   Filed 11/25/25   Page 23 of 46

Failure to properly list a drug product is prohibited and will render the drug misbranded. See 21 U.S.C. 381(p) and 352(o).

## Misbranding Violations

The potassium bicarbonate, sodium bicarbonate, progesterone, ferric subsulfate solution and tobramycin sulfate API labels identify Spectrum but do not designate the firm's role. Since these API labels bear only Spectrum's name without further qualifications, the labels falsely represent that Spectrum is the sole drug manufacturer. (See 21 CFR 201.1(h)(2)). Therefore, the API are misbranded under section 502(a) of the FD&C Act, 21 U.S.C. 352(a), because the labels are false and misleading.

## Conclusion

The deviations cited in this letter are not intended to be an all-inclusive list of deviations that exist at your facility. You are responsible for investigating and determining the causes of these deviations and for preventing their recurrence or the occurrence of other deviations.

If you are considering an action that is likely to lead to a disruption in the supply of drugs produced at your facility, FDA requests that you contact CDER's Drug Shortages Staff immediately, at drugshortages@fda.hhs.gov, so that FDA can work with you on the most effective way to bring your operations into compliance with the law. Contacting the Drug Shortages Staff also allows you to meet any obligations you may have to report discontinuances or interruptions in your drug manufacture under 21 U.S.C. 356C(b) and allows FDA to consider, as soon as possible, what actions, if any, may be needed to avoid shortages and protect the health of patients who depend on your products.

Correct the deviations cited in this letter promptly. Failure to promptly correct these deviations may result in legal action without further notice including, without limitation, seizure and injunction. Unresolved deviations in this warning letter may also prevent other Federal agencies from awarding contracts.

FDA may also withhold approval of requests for export certificates and approval of pending new drug applications or supplements listing your facility as a supplier or manufacturer until the above deviations are corrected. We may re-inspect to verify that you have completed your corrective actions.

After you receive this letter, respond to this office in writing within 15 working days. Specify what you have done since our inspection to correct your deviations and to prevent their recurrence. If you cannot complete corrective actions within 15 working days, state your reasons for delay and your schedule for completion.

Send your electronic reply to orapharm1_responses@fda.hhs.gov. Your written notification should refer to FEI #2246824 and Warning Letter CMS#579958. If you have any questions, contact Compliance Officer James Mason at james.mason@fda.hhs.gov or 570-262-0519.

Sincerely,
/S/

Diana Amador-Toro
Program Division Director/District Director
U.S. Food and Drug Administration
OPQO Division I/New Jersey District

cc:

Mr. Thomas N. Tyrer

Case 2:25-cv-02799-JAM-CSK    Document 33-2    Filed 11/25/25    Page 24 of 46

Vice President of Quality & Technical Service

Spectrum Laboratory Products, Inc.

14422 S. San Pedro Street

Gardena, CA 90248

Mr. Ibad Tirmizi

Director of Quality Assurance and Quality Control

Spectrum Laboratory Products, Inc.

769 Jersey Avenue

New Brunswick, NJ 08901



# Exhibit 5

**WARNING LETTER**

# Yino, Inc.

### MARCS-CMS 578566 — OCTOBER 28, 2019

⊖ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**Delivery Method:**

VIA UPS

**Product:**

Drugs

**Recipient:**

Mr. Huaijun Yin

Co-Owner

Yino, Inc.

2 Cuiping Erxiang

Yubei Qu Chongqing Shi, 401120

China

**Issuing Office:**

Center for Drug Evaluation and Research

10903 New Hampshire Avenue

Silver Spring, MD 20993

United States

October 28, 2019

**Warning Letter** 320-19-35

**AMENDED**

Dear Mr. Yin:

The U.S. Food and Drug Administration (FDA) inspected your facility, Yino Inc. at 2 Cuiping Erxiang, Yubei District, Chongqing, from March 18 to 22, 2019.

This warning letter summarizes significant deviations from current good manufacturing practice (CGMP) for active pharmaceutical ingredients (API).

Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your API are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B).

We reviewed your April 12, 2019, response to our Form FDA 483 in detail and acknowledge receipt of your subsequent correspondence.

During our inspection, our investigator observed specific deviations including, but not limited to, the following.

1. **Failure to transfer all quality or regulatory information received from the API manufacturer to your customers.**

You re-label active pharmaceutical ingredients (API) manufactured by other manufacturers and distribute the API to other facilities. API distributed by your firm was imported into the United States. For API you re-labeled, you omitted the name and address of the original manufacturer on certificates of analysis (COA) you generated with your company letterhead. For example, you omitted the manufacturer information for **(b)(4)** on the COA for several lots of **(b)(4)** API. **(b)(4)** API is used in injectable-grade drugs supplied to compounding pharmacies and intended for **(b)(4)** treatment.

Regulators and customers rely on COA to provide accurate information about the quality and source of drugs and their components. Omitting information on a COA compromises supply chain accountability and traceability and may put consumers at risk.

See our Guidance for Industry ICH Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients for more information on how API from original manufacturers as well as API re-packagers and re-labelers should be labeled to clearly identify the original API manufacturer as the API moves through the supply chain. The guidance can be found at the following website: https://www.fda.gov/media/71518/download.

We acknowledge that your response provided new procedures to ensure required information will be provided on the COA you generate in the future. The implementation and effectiveness of these procedures will be evaluated in a future inspection. Your response is inadequate as your retrospective review only covered a limited period of 15 months. However, the **(b)(4)** API you distributed notably has a **(b)(4)** expiration date.

In response to this letter, provide:

• A retrospective review to determine how your failure to provide required information may have affected drug quality. Ensure that your review goes back at least three years to fully cover the expiry or retest period for any API or intermediate that has been distributed by your firm.

• Any actions you have taken or will take, such as notifying customers, recalling drugs, or invalidating previously issued COA for any drugs still within their labeled retest dates

2. **Failure to establish, document, and implement an effective system to manage quality.**

Your firm failed to establish an adequate quality system and lacks quality oversight on documentation. For example, COA created and issued by your firm for several lots of **(b)(4)** API distributed to the U.S. market lacked signatures and dates from an authorized person in the Quality Unit. You included a test parameter and result that was not performed by the original API manufacturer, nor could you provide evidence that you had performed the test. Additionally, your firm lacked written procedures for re-labeling operations, drug release, document retention, and document control.

Failing to establish and implement a robust quality system, including an adequate organizational structure, at your firm compromises the assurance that the released API meet required specifications of quality and purity.

We acknowledge that your response provided new procedures to prevent similar errors from occurring. However, these procedures themselves do not demonstrate a robust quality system.

In response to this letter, provide a plan to establish, document, and implement an effective system for managing quality.

See FDA's guidance document Quality Systems Approach to Pharmaceutical CGMP Regulations for help implementing quality systems, and for risk management approaches to meet the requirements of CGMP regulations 21 CFR, parts 210 and 211. The guidance can be found at the following website: https://www.fda.gov/media/71023/download.

**CGMP Consultant Recommended**

Based upon the nature of the deviations we identified at your firm, we strongly recommend engaging a consultant qualified to evaluate your operations to assist your firm in meeting CGMP requirements. Your use of a consultant does not relieve your firm's obligation to comply with CGMP. Your firm's executive management remains responsible for resolving all deficiencies and systemic flaws to ensure ongoing CGMP compliance.

**Conclusion**

Deviations cited in this letter are not intended as an all-inclusive list. You are responsible for investigating these deviations, for determining the causes, for preventing their recurrence, and for preventing other deviations in all your facilities.

FDA placed your firm on Import Alert 66-40 on August 1, 2019.

Until you correct all deviations completely and we confirm your compliance with CGMP, FDA may withhold approval of any new applications or supplements listing your firm as a drug manufacturer.

Failure to correct these deviations may also result in the FDA continuing to refuse admission of articles manufactured at Yino Inc., 2 Cuiping Erxiang, Yubei District, Chongqing, into the United States under section 801(a)(3) of the FD&C Act, 21 U.S.C. 381(a)(3). Under the same authority, articles may be subject to refusal of admission, in that the methods and controls used in their manufacture do not appear to conform to CGMP within the meaning of section 501(a)(2)(B) of the FD&C Act, 21 U.S.C. 351(a)(2)(B).

After you receive this letter, respond to this office in writing within 15 working days. Specify what you have done since our inspection to correct your deviations and to prevent their recurrence. If you cannot complete corrective actions within 15 working days, state your reasons for delay and your schedule for completion.

Send your electronic reply to CDER-OC-OMQ-Communications@fda.hhs.gov or mail your reply to:

Cesar E. Matto M.S.
Senior Policy Advisor
U.S. Food and Drug Administration
White Oak Building 51, Room 4359
10903 New Hampshire Avenue
Silver Spring, MD 20993
USA

Please identify your response with FEI 3015238172.

Sincerely,

/S/

Francis Godwin
Director

Case 2:25-cv-02799-JAM-CSK     Document 33-2     Filed 11/25/25     Page 29 of 46

Office of Manufacturing Quality

Office of Compliance

Center for Drug Evaluation and Research

## Was this page helpful? * (required)

Yes

No

**Submit**

🇺🇸 An official form of the United States government. Provided by Touchpoints

# Exhibit 6

# Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**January 2025**
**Compounding and Related Documents**

# Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*https://www.fda.gov/drugs/guidance-compliance-regulatory-information/guidances-drugs*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**January 2025**
**Compounding and Related Documents**

*Contains Nonbinding Recommendations*

# TABLE OF CONTENTS

I.     **INTRODUCTION AND SCOPE**.............................................................................. 1

II.    **BACKGROUND** ........................................................................................................ 2

   A.   **Compounding From Bulk Drug Substances Under Section 503B**........................ 2

   B.   **Section 503B Bulks List** ............................................................................................ 3

      *1. Section 503B Bulks List History* ............................................................................ *3*

      *2. Nominations for the 503B Bulks List* .................................................................... *3*

      *3. Process for Developing the 503B Bulks List*.......................................................... *6*

   C.   **Categorization Under FDA's Interim Policy** ........................................................ 8

III.   **POLICY** ................................................................................................................... 10

   A.   **Compounding From Bulk Drug Substances Nominated for the 503B Bulks List** ................ 11

   B.   **Substances Not Nominated, Nominated Without Adequate Support, or Nominated On or After the Publication Date of This Guidance January 7, 2025** ................ 12

   C.   **Comments About Nominated Bulk Drug Substances**........................................ 13

*Contains Nonbinding Recommendations*

# Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic.  It does not establish any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

## I.    INTRODUCTION AND SCOPE

This guidance sets forth the Food and Drug Administration's (FDA or the Agency) interim regulatory policy concerning compounding by outsourcing facilities registered under section 503B of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 353b)[2] using bulk drug substances.  Section 503B of the FD&C Act includes certain restrictions on the bulk drug substances that outsourcing facilities can use in compounding and directs FDA to develop a list of bulk drug substances that can be used in compounding under that section.  FDA is developing that list of bulk drug substances (the 503B bulks list), and this guidance describes FDA's interim regulatory policy regarding outsourcing facilities that compound human drug products using bulk drug substances while the list is being developed.[3,4]

This guidance revises and replaces the guidance for industry *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act*

---

[1] This guidance has been prepared by multiple offices in the Center for Drug Evaluation and Research at the Food and Drug Administration.

[2] *Outsourcing facility* refers to a facility that meets the definition of an outsourcing facility under section 503B(d)(4) of the FD&C Act.

[3] Drug products compounded for use in animals are not within the scope of this guidance.

[4] FDA is developing a separate list of bulk drug substances that can be used in compounding under section 503A of the FD&C Act (the 503A bulks list).  Because section 503A contains different criteria for the 503A bulks list and provides for a different process for its development, the 503A bulks list is discussed in a separate guidance (see the guidance for industry *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503A of the Federal Food, Drug, and Cosmetic Act* (January 2025).  We update guidances periodically.  To make sure you have the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.

*Contains Nonbinding Recommendations*

issued in January 2017 (2017 503B Interim Policy Guidance).[5]  This revision does not change FDA's policy with respect to bulk drug substances that were nominated for inclusion on the 503B bulks list before the publication date of this guidance, January 7, 2025.  In contrast, bulk drug substances that are nominated on or after the date of publication of this guidance are not within the scope of the policy described in section III.A.2 of this guidance.  FDA intends to continue to receive and evaluate new nominations of bulk drug substances for inclusion on the 503B bulks list consistent with the process and clinical need standard established in the FD&C Act.

In general, FDA's guidance documents do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

### A.    Compounding From Bulk Drug Substances Under Section 503B

Section 503B of the FD&C Act describes the conditions that must be satisfied for human drug products compounded by an outsourcing facility to be exempt from the following three sections of the FD&C Act: (1) section 505 (21 U.S.C. 355) (concerning the approval of drugs under new drug applications or abbreviated new drug applications); (2) section 502(f)(1) (21 U.S.C. 352(f)(1)) (concerning the labeling of drugs with adequate directions for use); and (3) section 582 (21 U.S.C. 360eee-1) (concerning drug supply chain security requirements).

One of the conditions that must be met for a drug product compounded by an outsourcing facility to qualify for these exemptions is that the outsourcing facility does not compound drug products using a bulk drug substance unless (a) it appears on a list established by the Secretary of the Department of Health and Human Services (Secretary) identifying bulk drug substances for which there is a clinical need, or (b) the drug compounded from such bulk drug substances appears on the drug shortage list in effect under section 506E of the FD&C Act (21 U.S.C. 356e) at the time of compounding, distribution, and dispensing (see section 503B(a)(2)(A) of the FD&C Act).

A *bulk drug substance* is defined as meaning "the same as 'active pharmaceutical ingredient' as defined in [21 CFR] 207.1."[6]  *Active pharmaceutical ingredient* is defined as "any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or

---

[5] The 2017 version of the guidance revised the original guidance published in 2016, Guidance for industry, *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (June 2016) (the 2016 503B Interim Policy Guidance).

[6] 21 CFR 207.3.

*Contains Nonbinding Recommendations*

prevention of disease, or to affect the structure or any function of the body," but the term "does not include intermediates used in the synthesis of the substance."[7,8]

Bulk drug substances used in compounding under section 503B must also meet certain other requirements, including: (1) if an applicable monograph exists under the United States Pharmacopeia (USP), National Formulary (NF), or another compendium or pharmacopeia recognized by the Secretary for purposes of this paragraph, the bulk drug substance complies with the monograph; (2) the bulk drug substance must be manufactured by an establishment that is registered under section 510 of the FD&C Act (21 U.S.C. 360); and (3) the bulk drug substance must be accompanied by a valid certificate of analysis (COA).[9]

### B.    Section 503B Bulks List

#### 1.    Section 503B Bulks List History

Section 503B, added to the FD&C Act by the Drug Quality and Security Act (DQSA) in 2013, requires that FDA create a list of bulk drug substances for which there is a clinical need by publishing a notice in the *Federal Register* proposing bulk drug substances for inclusion on the list, providing a public comment period of 60 calendar days, and then publishing a notice in the *Federal Register* designating bulk drug substances for inclusion on the list.[10]  In the December 4, 2013, *Federal Register* (78 FR 72838), FDA published a notice inviting all interested persons to nominate bulk drug substances for inclusion on a list of bulk drug substances that can be used for compounding under section 503B of the FD&C Act.

#### 2.    Nominations for the 503B Bulks List

In response to the December 2013 *Federal Register* notice, over 2,000 substances were nominated for the 503B bulks list.  However, many of the nominations for the 503B bulks list were not for substances used in compounding as active ingredients, or they did not include sufficient supporting information to allow FDA to evaluate the nominated substances for

---

[7] See section 503B(a)(2) and 21 CFR 207.3.  Section 503B references the definition of *bulk drug substance* in FDA's drug establishment registration and listing regulations, which was codified at 21 CFR 207.3(a)(4) at the time section 503B was enacted.  In August 2016, FDA published a final rule, "Requirements for Foreign and Domestic Establishment Registration and Listing for Human Drugs, Including Drugs That Are Regulated Under a Biologics License Application and Animal Drugs" (Aug 31, 2016; 81 FR 60170), to update its registration and listing regulations in 21 CFR part 207, which made minor changes to the definition of bulk drug substance and moved the definition to 21 CFR 207.3.  The definition is also found in 21 CFR 207.1.  Under the previous definition, *bulk drug substance* was defined to mean "any substance that is represented for use in a drug and that, when used in the manufacturing, processing, or packaging of a drug, becomes an active ingredient or a finished dosage form of the drug, but the term does not include intermediates used in the synthesis of such substances."

[8] Inactive ingredients are not subject to section 503B(a)(2) or the policies described in this guidance because they are not included within the definition of a bulk drug substance.  See 21 CFR 207.3.  Pursuant to section 503B(a)(3), inactive ingredients used in compounding must comply with the standards of an applicable United States Pharmacopeia or National Formulary monograph, if a monograph exists.

[9] See section 503B(a)(2).

[10] See section 503B(a)(2)(A)(i).

*Contains Nonbinding Recommendations*

placement on the list. To improve the efficiency of the process for developing the 503B bulks list, FDA reopened the nomination process on July 2, 2014 (79 FR 37750) and provided more detailed information on what it needs to evaluate nominations for the list. FDA stated that bulk drug substances that were previously nominated would not be further considered unless they were renominated and those nominations were adequately supported. Substances that were not adequately supported would not be evaluated by FDA to be placed on the 503B bulks list. The notice stated that the following information about clinical need is necessary to provide adequate support for nominations to the 503B bulks list:

- A statement describing the medical condition(s) that the drug product to be compounded with the nominated bulk drug substances is intended to treat;

- A list of FDA-approved drug products, if any, that address the same medical condition;

- If there are any FDA-approved drug products that address the same medical condition, an explanation of why a compounded drug product is necessary;

- If the FDA-approved drug product is not suitable for a particular patient population, an estimate of the size of the population that would need a compounded drug product;

- A bibliography of safety and efficacy data for the drug product compounded using the nominated substance, if available, including any relevant peer-reviewed medical literature; and

- If there is an FDA-approved drug product that includes the bulk drug substance nominated, an explanation of why the drug product proposed to be compounded must be compounded from the bulk drug substance rather than with the FDA-approved drug product.

In the *Federal Register* of October 27, 2015 (80 FR 65770), FDA established a docket (October 2015 docket) where new nominations for these substances can be submitted with sufficient supporting information or where nominations for substances that were not previously nominated can be submitted.

In response to this request for nominations, as of publication of the 2016 503B Interim Policy Guidance, approximately 2,590 unique substances were nominated. Of those nominated substances:

- Approximately 1,740 are biological products (these are individual allergenic extracts) subject to approval in a biologics license application (BLA) under section 351 of the Public Health Service Act (PHS Act) (42 U.S.C. 262).

  These products are not eligible for the 503B bulks list because biological products subject to approval in a BLA under section 351 of the PHS Act are not eligible for the

*Contains Nonbinding Recommendations*

exemptions in section 503B of the FD&C Act.[11]  No biological products subject to approval in a BLA will be considered for the 503B bulks list.

- At least one[12] of the nominated substances is not a bulk drug substance.

  This is a finished drug product that was nominated by its brand name.  Finished drug products are not eligible for the 503B bulks list because they do not meet the definition of a bulk drug substance in 21 CFR 207.3.

- At least four of the nominated substances appear on the list of drugs that have been withdrawn or removed from the market because such drug products or components of such drug products have been found to be unsafe or not effective (withdrawn or removed list).

  Such substances cannot be used in compounding under section 503B of the FD&C Act and, therefore, are not eligible for inclusion on the 503B bulks list.[13]

- One of the nominated substances has no currently accepted medical use and is included on Schedule I of the Controlled Substances Act (CSA) (21 U.S.C. 812(c)).[14]

  The CSA does not allow possession or distribution of Schedule I substances (see 21 U.S.C. 841(a)(1) and 829), except for research purposes (21 U.S.C. 823(f)), and these substances will not be considered for the 503B bulks list at this time.  Those desiring to do research on a Schedule I substance can apply to do so under an investigational new drug application (IND).

- Of the substances that may be eligible for use in compounding under section 503B, approximately 650 substances were nominated without sufficient supporting evidence for FDA to evaluate them.

- The remaining substances that were nominated for inclusion on the 503B bulks list may be eligible for inclusion on the list and were nominated with sufficient supporting information for FDA to evaluate them.  However, FDA has identified significant safety risks relating to the use in compounded drug products of some of these bulk drug substances.

---

[11] See the guidance for industry *Mixing, Diluting, or Repackaging Biological Products Outside the Scope of an Approved Biologics License Application* (January 2018) for FDA's policies regarding State-licensed pharmacies, Federal facilities, and outsourcing facilities that mix, dilute, or repackage biological products outside the scope of an approved BLA.

[12] The nonprescription finished drug product Maalox was nominated.  Maalox is not a bulk drug substance.

[13] See section 503B(a)(4) of the FD&C Act.  See also 21 CFR 216.24.

[14] An extract of cannabidiol and tetrahydrocannabinol derived from marijuana (marihuana) was nominated.  This is a Schedule I substance.

*Contains Nonbinding Recommendations*

FDA's website identifies the following categories of substances nominated for the 503B bulks list:[15]

**503B Category 1 – Substances Nominated for the Bulks List Currently Under Evaluation:**  These substances may be eligible for inclusion on the 503B bulks list, were nominated with sufficient supporting information for FDA to evaluate them, and do not appear on any other list.

**503B Category 2 – Substances Nominated for the Bulks List That Raise Significant Safety Risks:**  These substances were nominated with sufficient supporting information to permit FDA to evaluate them, and they may be eligible for inclusion on the 503B bulks list. However, FDA has identified significant safety risks relating to the use of these substances in compounding pending further evaluation and, therefore, does not intend to adopt the policy described for the substances in Category 1.  If FDA adds a substance to Category 2, it will publish a public communication (e.g., a safety alert) describing the safety risks and will post the communication on FDA's human drug compounding website[16] advising that the substance has been added to Category 2 and is not within the scope of the policies regarding substances in Category 1.

**503B Category 3 – Substances Nominated for the Bulks List Without Adequate Support:**  These substances may be eligible for inclusion on the 503B bulks list but were nominated with insufficient supporting information for FDA to evaluate them.  These substances can be renominated with sufficient supporting information through a docket that FDA has established, as discussed below in section III.B.

> *3.    Process for Developing the 503B Bulks List*

FDA is currently evaluating the bulk drug substances nominated for the 503B bulks list with sufficient supporting information for evaluation.  FDA is considering a number of factors in prioritizing the order in which it reviews these nominated bulk drug substances, including but not limited to the following:

---

[15] See Bulk Drug Substances Used in Compounding Under Section 503B of the FD&C Act, updated September 27, 2024, available at https://www.fda.gov/drugs/human-drug-compounding/bulk-drug-substances-used-compounding-under-section-503b-fdc-act.  As discussed in the July 2014 *Federal Register* notice requesting nominations for the 503B bulks list (79 FR 37750), nominators were to confirm that all substances nominated for the list are active ingredients that meet the definition of a bulk drug substance.  Inclusion of a substance in any of these categories does not reflect a determination by FDA that the substance is a bulk drug substance.  Whether a substance is a bulk drug substance subject to the conditions in section 503B(a)(2) depends on whether it meets the definition of a bulk drug substance in 21 CFR 207.3.  If the substance is used in a compounded drug product as an inactive ingredient, then it does not meet the definition of a bulk drug substance in 21 CFR 207.3, is not subject to the conditions in section 503B(a)(2), and need not appear on the 503B bulks list to be eligible for use in compounding.  Instead, when used as an inactive ingredient, the substance is subject to the conditions in section 503B(a)(3), which applies to ingredients other than bulk drug substances used in compounded drug products.

[16] *See* https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.  FDA also encourages compounding facilities to subscribe to FDA's list serve to receive updates at https://www.fda.gov/drugs/human-drug-compounding/information-outsourcing-facilities#subscribe.

*Contains Nonbinding Recommendations*

- Safety concerns about use of the bulk drug substance in compounding

- Whether the bulk drug substance was nominated by multiple parties or identified as necessary by medical professional organizations

- The efficiency with which the evaluation can be completed, based on ease of acquiring the necessary information to conduct the review, available resources, and other logistical issues

FDA may also group some nominated drug substances to facilitate efficient review and discussion.  These include drug substances that raise similar issues (e.g., vitamins, botanicals) or that are nominated for the treatment of the same condition (e.g., warts).

FDA intends to publish a notice in the *Federal Register* that describes FDA's proposed position on each substance FDA has evaluated, along with the rationale for that proposal, for public comment.  We note that there is no requirement in section 503B to consult the Pharmacy Compounding Advisory Committee (PCAC) before developing a 503B bulks list, as is required by section 503A(c)(1) for a separate list of bulk drug substances that can be used in compounding under section 503A of the FD&C Act (503A bulks list).  However, after considering public comment on the nominated substances, FDA will determine whether PCAC input on any of the substances would be helpful to the Agency in making its determination, and if so, it will seek PCAC input.  Once FDA makes a determination, it will publish in the *Federal Register* a list identifying the bulk drug substances for which it has determined there is a clinical need and FDA's rationale in making that determination.  FDA will also publish in the *Federal Register* a list of those substances it considered but found that there is no clinical need to use in compounding and FDA's rationale in making this determination.

Once FDA publishes a 503B bulks list in the *Federal Register* that reflects its determination regarding particular bulk drug substances, drug products compounded with substances on the 503B bulks list will be eligible for the section 503B exemptions, provided the drug products meet the other conditions of section 503B.[17]  Once FDA has published in the *Federal Register* its decision not to place a particular substance on the 503B bulks list, the substance is no longer within the scope of the policy described in this guidance.

FDA intends to evaluate the substances nominated for the 503B bulks list on a rolling basis.  FDA will begin by publishing a *Federal Register* notice identifying a group of substances (e.g., 10 substances) that it has considered and whether it proposes the substances for inclusion on the 503B bulks list.   Under section 503B, an outsourcing facility may only compound using bulk drug substances that are on FDA's 503B bulks list or that are used to compound drug products that appear on FDA's drug shortage list in effect under section 506E of the FD&C Act at the time of compounding, distribution, and dispensing.  To avoid unnecessary disruption to patient treatment while FDA considers the substances that were nominated with sufficient support to permit FDA to evaluate them, FDA is issuing this guidance stating that at this time it does not intend to take action against an outsourcing facility for failing to compound in accordance with section 503B(a)(2) if certain conditions are met.  Those conditions include that the nomination

---

[17] See section 503B(a)(11) of the FD&C Act.

*Contains Nonbinding Recommendations*

for the relevant bulk drug substance appears on Category 1 on FDA's website.  As described below, FDA does not intend to categorize bulk drug substances as described in section II.B.2 that are nominated on or after the publication date of this guidance.

### C.    Categorization Under FDA's Interim Policy

Section 503B of the FD&C Act directs FDA to establish a list of bulk drug substances for which there is a clinical need.[18]  Stakeholders advised FDA that some of the compounded drug products, which patients may have received before enactment of DQSA in 2013, were important for patient care.  Stakeholders further advised FDA that some of the compounded drug products containing nominated bulk drug substances were important for "office stock" or for "office use" by hospitals, clinics, or health care practitioners to administer to patients who present with an immediate need for a compounded drug product.[19]  In 2016, FDA issued 2016 503B Interim Policy Guidance setting forth its interim policy on compounding using bulk drug substances by outsourcing facilities.  The guidance explained that the purpose of the interim policy was to "avoid unnecessary disruption to patient treatment while FDA considers the bulk drug substances that were nominated . . . with sufficient support to permit FDA to evaluate them."[20]  As described in the 2016 503B Interim Policy Guidance, FDA categorized bulk drug substances that had been nominated by a certain date and explained an interim policy under which the Agency did not intend to take action against an outsourcing facility for compounding drug products using those bulk drug substances if certain conditions were met.  However, stakeholders advised FDA that, less than 3 years after DQSA was enacted, certain compounded drug products containing bulk drug substances that had not yet been nominated were important for patient care.  Accordingly, in 2017, FDA published the 2017 503B Interim Policy Guidance to provide for ongoing categorization of bulk drug substances newly nominated to the October 2015 docket.

As discussed further below, since FDA developed the 2017 503B Interim Policy Guidance, stakeholders have had substantial opportunity to nominate new bulk drug substances for categorization.  As reflected in the updated policy described in section III below, FDA has determined that ongoing categorization of newly nominated substances, as described in the 2017 503B Interim Policy Guidance, no longer serves the interim policy's stated objective of avoiding unnecessary disruption to patient treatment and does not otherwise benefit public health.  Categorizing substances nominated on or after the publication date of this guidance would unnecessarily expose patients to the risks associated with drug products compounded from such bulk drug substances.

---

[18] See section 503B(a)(2)(A)(i) of the FD&C Act.

[19] In contrast to compounders operating under section 503A, outsourcing facilities can distribute compounded drug products to health care practitioners or health care facilities without first receiving a prescription for an identified individual patient.  Compare sections 503B(d)(4)(C) and section 503A(a) of the FD&C Act; see also the guidance for industry *Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act* (December 2016).

[20] 2016 503B Interim Policy Guidance at 7, available at https://www.regulations.gov/document/FDA-2015-D-3539-0014.

*Contains Nonbinding Recommendations*

Drug products compounded from bulk drug substances nominated for inclusion on the 503B bulks list may present particular risks when FDA has not yet completed the process to conclude whether they will be placed on the 503B bulks list.  Pursuant to the clinical need standard in section 503B(a)(2)(A) of the FD&C Act, FDA places a bulk drug substance on the 503B bulks list if the Agency concludes that there is a clinical need for an outsourcing facility to compound a drug product, and the drug product must be compounded using the bulk drug substance.[21]  Under this standard, FDA proposes adding a bulk drug substance to the 503B bulks list only after Agency medical and scientific experts have, among other things, evaluated the physical and chemical characterization of the substance; any safety issues raised by the use of the substance in compounded drug products; current and historical use of the substance in compounded drug products; and available evidence of effectiveness or lack of effectiveness of a drug product compounded with the substance, if any such evidence exists, and preliminarily concluded that these factors weigh in favor of inclusion of the bulk drug substance on the list.  FDA must consider public comment regarding a proposal before making its final determination.[22]  Although FDA's evaluation of a substance for the 503B bulks list is, necessarily, far less rigorous and less comprehensive than the Agency's review of drugs as part of the new drug approval process, this evaluation process for clinical need is important to help limit patient exposure to compounded drug products, which have not been demonstrated to be safe and effective, to those situations in which the compounded drug product is necessary for patient treatment, and serves an important role in preserving the integrity of the drug approval process.[23]

In the early days of DQSA implementation, FDA recognized that patients may have a medical need for treatment with certain drugs that they may have received prior to enactment of the DQSA, but that were compounded from bulk drug substances that the Agency had not yet evaluated for inclusion on the 503B bulks list.  In developing the 2017 503B Interim Policy Guidance, FDA weighed these public health interests and concluded that, at that early stage of section 503B implementation, the potential patient benefits of such a policy outweighed the risks.  Importantly, FDA characterized the guidance as an *interim* policy because the Agency intended for it to be temporary.  For the reasons that follow, FDA is ending categorization of newly nominated substances because the Agency believes such a policy no longer serves the guidance's stated objective of preventing unnecessary disruption to patient treatment, and therefore, the balance of public health interests supporting the policy has changed.

In the approximately 7 years since FDA issued the 2017 503B Interim Policy Guidance, providing for ongoing categorization of bulk drug substances newly nominated to the October 2015 docket, nominators have had substantial opportunity to nominate bulk drug substances with sufficient supporting information for placement in Category 1.  A substance that has not been

---

[21] In addition, with respect to a bulk drug substance that is a component of an FDA-approved drug product, FDA considers whether there is an attribute of the FDA-approved drug product that makes it medically unsuitable for the proposed condition and the compounded drug product is intended to address that attribute, and whether the drug product must be compounded from a bulk drug substance.  See the guidance for industry *Evaluation of Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (March 2019) (503B Evaluation Guidance) at 9.

[22] Sections 503B(a)(2)(A)(i)(II) and (III) of the FD&C Act.

[23] See the 503B Evaluation Guidance at 9.

9

*Contains Nonbinding Recommendations*

used to compound drug products during that period cannot reasonably be considered necessary to avoid disruption to patient treatment.  Nor do we expect the policy in section III.B to adversely affect market stability because, among other reasons, FDA intends to retain the policy, described in section III.A.2 of this guidance, for bulk drug substances already placed in existing Category 1.  In addition, FDA intends to continue to receive and evaluate new nominations for inclusion on the 503B bulks list consistent with the process and clinical need standard established in the FD&C Act.

Accordingly, the balance of public health interests relating to categorization of newly nominated bulk drug substances has changed.  As discussed above, FDA's process for evaluating and proposing inclusion of bulk drug substances on the 503B bulks list ensures that FDA and the public can carefully consider a bulk drug substance nominated for the 503B bulks list before outsourcing facilities can use it in compounding under section 503B of the FD&C Act.  During this process, FDA may, for example, uncover safety risks or effectiveness concerns, or concerns about the physical and chemical characterization of the substance, that could place patients at risk.  These concerns may not be apparent until FDA and other experts conduct the evaluation of the substance under consideration for the 503B bulks list.[24]  FDA also believes that the public health is best served by FDA leveraging its limited resources to develop the 503B bulks list rather than to categorize newly nominated substances.

However, FDA does recognize that certain substances that currently appear in Category 1 may be important for patient care and that the Agency has not yet made a final determination as to whether these substances will appear on the 503B bulks list.  Thus, at this time, FDA is retaining the policy outlined in section III.A.2 of this guidance, which concerns substances nominated prior to the date of publication of this guidance, until the Agency publishes a notice in the *Federal Register* making a final listing determination for such substances, or unless the Agency removes the substances from Category 1 based on, for example, information about safety risks.

## III.    POLICY

As discussed below, FDA does not intend to categorize bulk drug substances that the public nominates for inclusion on the 503B bulks list on or after the publication date of this guidance January 7, 2025.  Although the Agency intends to continue to receive and evaluate new nominations of bulk drug substances for possible inclusion on the 503B bulks list, FDA does not intend to place such bulk drug substances in categories published on FDA's website prior to evaluating them in accordance with section 503B(a)(2).  FDA is evaluating bulk drug substances nominated for the 503B bulks list on a rolling basis.

---

[24] Prior to placing an adequately supported substance in Category 1, it has been FDA's practice to preliminarily assess whether the substance appears to present significant safety risks such that it should be placed in Category 2. However, some risks may not be apparent until FDA conducts the evaluation under the statutory clinical need standard, considers public comment, and makes a determination as to whether the substance meets the statutory clinical need standard for placement on the 503B bulks list.

*Contains Nonbinding Recommendations*

A.      **Compounding From Bulk Drug Substances Nominated for the 503B Bulks List**

Under section 503B(a)(2)(A) of the FD&C Act, a bulk drug substance cannot be used in compounding unless it is used to compound a drug product that appears on FDA's drug shortage list at the time of compounding, distribution, and dispensing, or it appears on the 503B bulks list.[25]  However, at this time, FDA does not intend to take action against an outsourcing facility for compounding drug products using certain bulk drug substances that are not eligible for use in compounding under section 503B, as outlined below.

1.   Bulk drug substances used to compound drug products in shortage

At this time, FDA does not intend to take action against an outsourcing facility for compounding a drug product using a bulk drug substance that is not on the 503B bulks list if the drug product compounded from the bulk drug substance: (i) appeared on FDA's drug shortage list within 60 days of distribution and dispensing and (ii) was to fill an order that the outsourcing facility received for the drug product while it was on FDA's drug shortage list.[26]

2.   Bulk drug substances not used to compound drug products in shortage

At this time FDA does not intend to take action against an outsourcing facility for compounding a drug product using a bulk drug substance that does not appear on the 503B bulks list, that is not used to compound a drug product that appears on FDA's drug shortage list at the time of compounding, distribution, and dispensing, and that is not within the scope of the policy described in (1)(i) and (ii) above, if all of the following circumstances are present:

a.   The bulk drug substance appears on 503B Category 1 on FDA's website at https://www.fda.gov/media/94164/download.  A Category 1 substance may be eligible for inclusion on the 503B bulks list, was nominated for inclusion on the 503B bulks list before the publication date of this guidance with adequate  supporting information for FDA to evaluate the substance, and has not been identified by FDA as a substance that appears to present a significant safety risk in compounding before a determination as to whether to place it on the 503B bulks list has been made.

---

[25] See section 503B(a)(2)(A) of the FD&C Act.

[26] An outsourcing facility may not be able to predict when a drug shortage will be resolved, and the facility may have orders for a compounded drug product in-house that were in progress when the drug product was removed from  FDA's drug shortage list (e.g., the outsourcing facility may have compounded a drug-product while it was in shortage, but the shortage ended while the outsourcing facility awaits the results of sterility testing before release). This policy provides some regulatory flexibility where an outsourcing facility fills orders that it received while a drug was in shortage.  However, this policy does not pertain to an outsourcing facility continuing to fill orders received after the shortage ends or if the outsourcing facility continues to fill orders more than 60 days after the drug product was removed from FDA's drug shortage list.

*Contains Nonbinding Recommendations*

b.  The original manufacturer and all subsequent manufacturers of the bulk drug substance are establishments that are registered under section 510 (including foreign establishments that are registered under section 510(i)) of the FD&C Act;

c.  The bulk drug substance is accompanied by a valid COA;

d.  If the bulk drug substance is the subject of an applicable USP or NF monograph, the bulk drug substance complies with the monograph; and

e.  The drug product compounded using the bulk drug substance is compounded in compliance with all other provisions of section 503B of the FD&C Act.

*Original manufacturer* means the entity that originally produced the bulk drug substance and not a subsequent packer, repacker, labeler, or distributor.

A drug product compounded using a bulk drug substance is not within the scope of the policy described in section III.A.2 unless all of the above circumstances (a)-(e) are present. For example, drug products compounded from the following bulk drug substances are not within the scope of this policy: (1) substances not nominated for the 503B bulks list or that were nominated on or after the publication date of this guidance January 7, 2025; and (2) substances that are the subject of a final determination as to whether they will be included, or not included, on the 503B bulks list.

### B.  Substances Not Nominated, Nominated Without Adequate Support, or Nominated On or After the Publication Date of This Guidance January 7, 2025

As stated above, one of the categories of bulk drug substances FDA has identified on its website contains nominated substances that may be eligible for inclusion on the 503B bulks list, but that FDA is unable to evaluate for inclusion on the list at this time because the substances were nominated with insufficient supporting evidence for FDA to evaluate them (503B Category 3). New nominations for these substances with sufficient supporting information or nominations for substances that were not previously nominated can be submitted to the October 2015 docket.

After a substance is nominated to the October 2015 docket,[27] FDA will determine whether the nomination is supported with sufficient supporting information to allow FDA to evaluate it.

Previously, after FDA made that determination, the nominated substance was placed in one of the three categories described in section II.B.2 above, and the categorization was published on the FDA website. Section III.A.2 of this guidance sets forth a policy that addresses substances once they have been categorized. This guidance retains the policy described in section III.A.2 with respect to substances that appear in the categories described in section II.B.2.

---

[27] This includes new nominations of substances submitted with sufficient supporting information.

*Contains Nonbinding Recommendations*

However, with respect to substances nominated on or after the publication date of this guidance January 7, 2025, including new nominations of substances that currently appear in Category 3,[28] FDA does not intend to place such substances into the categories described in section II.B.2. Accordingly, substances nominated on or after the publication date of this guidance are not within the scope of the policy described in section III.A.2 of this guidance.  FDA intends to continue to evaluate such substances, provided they are nominated with sufficient supporting information to permit an evaluation, for inclusion on the 503B bulks list pursuant to section 503B(a)(2) of the FD&C Act.[29]

### C.    Comments About Nominated Bulk Drug Substances

If a nominator feels that a substance that it nominated before the publication date of this guidance does not appear on the appropriate category as described in this guidance, the nominator can submit a comment to docket number FDA-2015-N-3469.  If the nominator has additional information on a previously nominated substance that was placed in Category 3, the nominator can submit a new nomination for the substance that includes the additional information.  As described in section III.B of this guidance, FDA does not intend to categorize a substance nominated on or after the publication date of this guidance January 7, 2025.  However, if the new nomination includes sufficient supporting information to permit an evaluation, FDA intends to consider the substance for inclusion on the 503B bulks list.

A nominator may also submit a comment to the docket requesting withdrawal of any of its nominations.  If the substance that is the subject of such nomination appears in one of the categories, and the party nominating the substance was the sole nominator, FDA will update the categories described in this guidance to reflect the withdrawn nomination.[30]  FDA intends to provide notice to the public before removing any nominated substances from Category 1 or Category 2.

Withdrawal of a nomination upon the nominator's request, and if applicable, a resulting update to the categories described in this guidance, do not reflect a determination by FDA regarding the validity of the nomination or of any reasons given by the nominator for requesting withdrawal.  In addition, FDA may continue to evaluate a substance at its discretion even if the nominator submits a comment requesting withdrawal of the nomination.

---

[28] This includes new nominations of substances in Category 3 that include sufficient supporting information to permit FDA evaluation for the 503B bulks list.

[29] See also the 503B Evaluation Guidance.

[30] If multiple parties nominated the same substance, each party that nominated the substance must withdraw its nomination for the nominated substance to be considered withdrawn and for the categories to be updated, if applicable, to reflect that withdrawal.