1   Eric J. Beste (SBN 226089)
    Eric.Beste@btlaw.com
2   Amy C. Poyer (SBN 277315)
    Amy.Poyer@btlaw.com
3   Mark Crandley (admitted *pro hac vice*)
    Mark.Crandley@btlaw.com
4   David A. Frazee (admitted *pro hac vice*)
    David.Frazee@btlaw.com
5   **BARNES & THORNBURG LLP**
6   655 West Broadway, Suite 1300
    San Diego, California 92101
7   Telephone:    (619) 321-5000
    Facsimile:    (310) 284-3894
8
    Attorneys for Plaintiff
9   PROFESSIONAL COMPOUNDING CENTERS
    OF AMERICA, INC.
10
                **IN THE UNITED STATES DISTRICT COURT**
11
            **FOR THE EASTERN DISTRICT OF CALIFORNIA**
12
    PROFESSIONAL COMPOUNDING CENTERS OF
13  AMERICA, INC.,

14          *Plaintiff,*

15  *v.*                                          Case No.: 2:25-cv-02799-JAM-CSK

16  ANNE SODERGREN, Executive Officer of the      Amended Complaint for Declaratory
    California State Board of Pharmacy, JULIE ANSEL,   and Injunctive Relief to Prevent Civil
17  Deputy Executive Officer of the California State Board   Rights Violations (42 U.S.C. § 1983 and
    of Pharmacy, SEUNG OH, President of the California   28 U.S.C. §§ 2201, 2202)
18  State Board of Pharmacy, JESSICA CROWLEY, Vice
    President of the California State Board of Pharmacy,   **AMENDED COMPLAINT FOR**
19  TREVOR CHANDLER, Treasurer of the California   **DECLARATORY, INJUNCTIVE,**
    State Board of Pharmacy, RENEE ARMENDARIZ   **AND OTHER RELIEF**
20  BARKER, Member of the California State Board of
    Pharmacy, KARTIKEYA JHA, Board Member of the
21  California State Board of Pharmacy, SATINDER
    SANDHU, Member of the California State Board of
22  Pharmacy, MARIA D. SERPA, Member of the
    California State Board of Pharmacy, NICOLE
23  THIBEAU, Member of the California State Board of
    Pharmacy, JEANETTE DONG, Member of the
24  California State Board of Pharmacy, JEFF HUGHES,
    Member of the California State Board of Pharmacy,
25  CLAUDIA L. MERCADO, Member of the California
    State Board of Pharmacy, JASON NEWELL Member of
26  the California State Board of Pharmacy, and RICARDO
    SANCHEZ, Member of the California State Board of
27  Pharmacy, *all in their official capacities*,

28          *Defendants.*

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

## INTRODUCTION

1.     Plaintiff Professional Compounding Centers of America, Inc. ("PCCA") brings this civil rights action to prevent the unconstitutional enforcement of regulations recently promulgated by the California State Board of Pharmacy ("the Board"). These regulations—which were first enforceable on October 1, 2025—unlawfully restrict PCCA's protected commercial speech and require PCCA to publicly disclose its confidential and sensitive trade secret information. PCCA and others have advised the Board that the regulations in question would not improve consumer safety or product quality, but would instead impose unconstitutional burdens on PCCA's free speech rights and unlawfully publicize PCCA's confidential commercial information and destroy its property rights. Despite the critical commentary provided by PCCA and others, the Board plowed ahead with promulgating regulations that it intends to enforce in an unconstitutional manner. Accordingly, PCCA has no choice but to bring this civil action against the members of the Board and its Executive Director (collectively, "Defendants") in their official capacities.

2.     Specifically, PCCA seeks injunctive and declaratory relief preventing Defendants from the unconstitutional enforcement of amendments to the Compounded Drug Preparations Regulations, specifically Title 16, Division 17, Articles 4.5, 4.6, 4.7 and 4.8 of the California Code of Regulations ("the Regulations"), which were effective and enforceable on October 1, 2025. *See* Ex. A (excerpt highlighting relevant sections from the Regulation).

3.     PCCA provides pharmaceutical ingredients, including active pharmaceutical ingredients ("APIs"), to compounding pharmacies throughout the United States, including in California. PCCA does not itself make a finished compounded drug, such as a pill or cream that is ready for patient use. Rather, compounding pharmacies purchase PCCA's ingredients to be components in a finished compounded drug product that is provided to a patient. Each ingredient component PCCA sells to a compounding pharmacy is accompanied by a PCCA Certificate of Analysis ("COA's"), which states, among other things, the specifications and testing PCCA completed for the product.

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Barnes &
Thornburg LLP
Attorneys At Law
San Diego

4.      The Regulations, as applied, compel PCCA to disclose on its Certificates of Analysis ("COAs") the confidential list of companies from which PCCA purchases APIs and other drug ingredients ("Upstream Sources")—information that constitutes protected trade secrets.

5.      The Regulations compel disclosure of proprietary Upstream Source identities that PCCA has developed through more than 40 years of investment and maintains as confidential business information. The compelled disclosure of this trade secret information serves no legitimate public health purpose and constitutes both a violation of the First Amendment an unconstitutional taking under the Fifth Amendment, and an impermissibly vague law under the First and Fourteenth Amendments.

6.      As applied, the Regulations violate the Fifth Amendment to the United States Constitution by effecting a regulatory taking.  The Regulations, as applied, *require* PCCA to publicly disclose its confidential business information—that is, the carefully curated list of PCCA-approved sources of APIs and other ingredients that PCCA has developed over more than 40 years through substantial investment in due diligence, facility audits, and quality control systems.  These sources are thoroughly vetted by PCCA, but their identities are kept confidential. As such, this information constitutes proprietary and commercially sensitive information, the disclosure of which is not required of PCCA by federal or other state regulators. Nor is the disclosure of this confidential commercial information necessary for the safe use of APIs by pharmacy customers. This forced disclosure of PCCA's valuable confidential information constitutes a taking of property without any (let alone "just") compensation, and violates the Takings Clause of the Fifth Amendment to the Constitution of the United States.

7.      The Regulations, as applied by the Board, violate and unconstitutionally restrict PCCA's First Amendment right to free speech. The Board interprets the Regulations—which use the definite article "the" before the word "manufacturer"—as compelling PCCA to designate a single Upstream Source as "the manufacturer" of the APIs and other ingredients PCCA sells. This characterization is false, misleading, and controversial, as PCCA is itself a manufacturer under both California and federal law and believes it is "the manufacturer" of the APIs and other ingredient components it sells to its customers. Yet the Board's application of the Regulations

1  forces PCCA to communicate that another entity—and that entity alone—is "the manufacturer,"

2  thereby compelling PCCA to adopt and disseminate a contested legal and factual position about

3  the identity of the manufacturer responsible for the pharmaceutical ingredients PCCA sells. This

4  compelled designation of another entity as "the manufacturer" is not a disclosure of purely factual

5  and uncontroversial information, but rather government-mandated speech on a matter where

6  reasonable minds can differ. Such compelled speech is a patent violation of the First Amendment

7  to the United States Constitution.

8         8.     Defendants' threatened enforcement of the Regulations violates PCCA's

9  constitutional rights and serves no legitimate public health purpose. Although Defendants point to

10  the United States Food and Drug Administration ("FDA") in support of its Regulations, in fact, the

11  FDA does not require PCCA to disclose its confidential commercial information on its COAs or to

12  compounding pharmacies. Rather, the FDA accepts COAs that do not identify PCCA's Upstream

13  Source. Neither the FDA nor any other state regulator has determined that such disclosure on the

14  COAs used by PCCA serves public health purposes. On this point, California stands alone.

15         9.     There is no legitimate public health reason to compel PCCA to disclose its

16  confidential Upstream Source identities—information that constitutes protected trade secrets—

17  when PCCA's own testing, quality control, and certification processes assure ingredient safety.

18  PCCA is a manufacturer, under California and federal law. As the manufacturer shipping directly

19  to pharmacy customers, PCCA (and not the Upstream Source or other supplier) holds *direct*

20  responsibility for the products it sells. The Regulations, as applied, only serve to destroy PCCA's

21  confidential business information and trade secrets, restrict PCCA's truthful speech that it is "the

22  manufacturer" of the products it sells, and compel PCCA to make false and factually controversial

23  statements, which mislead rather than serve the public interest.

24         10.    Despite these constitutional infirmities, Defendants have made clear that they will

25  seek to vigorously enforce their unconstitutional interpretation of what entity qualifies as the

26  "manufacturer" under the Regulations, and will bring enforcement proceedings against PCCA and

27  its pharmacy customers based on this flawed application of the Regulations.  This unlawful

28  scheme places PCCA and its pharmacy customers at imminent risk of being subject to

1  enforcement proceedings brought on behalf of the Board, and ultimately at risk of being

2  sanctioned for violations of the Regulations.  As a wholesale distributor licensed by the Board,

3  PCCA is directly subject to the Board's authority.  In addition to causing direct and substantial

4  harm to PCCA's constitutional rights, PCCA will also suffer significant pecuniary harm when its

5  customer pharmacies—out of fear—cease purchasing products from PCCA.  Because PCCA faces

6  an imminent threat of such concrete and particularized injuries, it brings this Complaint for

7  Declaratory and Injunctive relief against the Defendants.

8                                         **PARTIES**

9         11.     Professional Compounding Centers of America, Inc. is a Texas corporation with its

10 headquarters in Houston, Texas. For over 40 years, PCCA has served as a leader in the

11 compounded drug industry and in the creation of personalized medicine and innovative solutions

12 to assist patients in need. PCCA sells to its customers (licensed compounding pharmacies) devices

13 and ingredients, including APIs.  Compounding pharmacies use PCCA ingredients to create

14 personalized, compounded medicines that cannot be obtained through traditional mass-produced

15 commercial drug products.  PCCA's ingredients are widely considered to meet the highest

16 standards in the compounded drug industry, and are trusted by compounding pharmacies to supply

17 safe and effective medicines to patients.

18        12.     PCCA is a manufacturer under California law. California Business and Professions

19 Code Section 4033 defines "manufacturer" to include "every person who prepares, derives,

20 produces, compounds, or repackages any drug." PCCA meets this definition through multiple

21 manufacturing activities, including by: producing compounding pharmaceutical ingredients

22 through testing, quality control, and certification procedures; repackaging bulk ingredients into

23 smaller quantities suitable for distribution to compounding pharmacies; and preparing

24 pharmaceutical ingredients for distribution through labeling, documentation, and quality assurance

25 processes.

26        13.     PCCA is a manufacturer under federal law. PCCA is registered with the FDA as a

27 drug establishment, identifying its business operations as "relabel" and "repack." PCCA also

28 engages in other operations with respect to the APIs and other drug ingredients it sells into

1    California, further confirming that PCCA is a manufacturer under California and federal law. *See*

2    21 C.F.R. § 207.1. And, as the manufacturer, the FDA requires PCCA to follow current Good

3    Manufacturing practices for its APIs and other ingredient components. 21 U.S.C. § 351(a)(2)(B).

4          14.     PCCA, which is headquartered in Texas, is registered in the State of Texas as a

5    "manufacturer." Texas law defines "manufacturer" as a person licensed or approved by the FDA

6    to engage in the manufacture of drugs, consistent with the FDA's definition under the Prescription

7    Drug Marketing Act of 1987, and requires such manufacturers to obtain a license from the Texas

8    Department of State Health Services and comply with current Good Manufacturing Practices. Tex.

9    Health & Safety Code § 431.401(4-a); 25 Tex. Admin. Code §§ 229.419–229.430. PCCA holds

10    such a license and complies with these requirements.

11          15.    Beyond Texas, PCCA is also registered as a manufacturer with the following states

12    and agencies: the U.S. Drug Enforcement Administration ("DEA"), District of Columbia,

13    Delaware, Idaho, Kansas, Michigan, Minnesota, New Jersey, New Mexico, North Carolina,

14    Oklahoma, Oregon, Pennsylvania, South Carolina, Vermont, Virginia, and Wyoming.

15          16.    PCCA is subject to the Board's authority as a licensed nonresident wholesaler, as

16    that term is defined by California Business and Professions Code Section 4043.  PCCA's license

17    from the Board authorizes PCCA to ship its drugs to its customers in California. However, unlike

18    other states, California only requires entities with manufacturing facilities **in California** to be

19    registered as a "manufacturer."  Cal. Health & Safety Code § 111615. Thus, while PCCA is a

20    "manufacturer" under California law, because its operations and manufacturing activities only

21    occur outside the State itself, PCCA may register only as a wholesaler in California.

22          17.    The California State Board of Pharmacy consists of 13 members. The Governor of

23    the State of California appoints eleven members.  The remaining two members are appointed by

24    the California Senate Rules Committee and the Speaker of the Assembly. Collectively, the

25    members select an executive officer. The executive officer directs operations and oversees staff,

26    including the California State Board of Pharmacy investigators.

27

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

18.    Anne Sodergren is the Executive Officer for the California State Board of Pharmacy, and maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

19.    Julie Ansel is the Deputy Executive Director of the California State Board of Pharmacy. Julie Ansel maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

20.    Seung Oh is the President of the California State Board of Pharmacy. Seung Oh was appointed by the Governor of California. Seung Oh maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

21.    Jessica Crowley is the Vice President of the California State Board of Pharmacy. Jessica Crowley was appointed by the Governor of California. Jessica Crowley maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

22.    Trevor Chandler is the Treasurer of the California State Board of Pharmacy. Trevor Chandler was appointed by the Governor of California. Trevor Chandler maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

23.    Renee Armendariz Barker is a Board Member of the California State Board of Pharmacy. Renee Armendariz Barker was appointed by the Governor of California. Renee Armendariz Barker maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

24.    Kartikeya Jha is a Board Member of the California State Board of Pharmacy. Kartikeya Jha was appointed by the Governor of California. Kartikeya Jha maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

25.    Satinder Sandhu is a Board Member of the California State Board of Pharmacy. Satinder Sandhu was appointed by the Governor of California. Satinder Sandhu maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

26.    Maria D. Serpa is a Board Member of the California State Board of Pharmacy. Maria D. Serpa was appointed by the Governor of California. Maria D. Serpa maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1    27.    Nicole Thibeau is a Board Member of the California State Board of Pharmacy.

2    Nicole Thibeau was appointed by the Governor of California. Nicole Thibeau maintains an office

3    at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

4    28.    Jeanette Dong is a Public Board Member of the California State Board of

5    Pharmacy. Jeanette Dong was appointed by the California Speaker of the Assembly.  Jeanette

6    Dong maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

7    29.    Jeff Hughes is a Public Board Member of the California State Board of Pharmacy.

8    Jeff Hughes was appointed by the California Speaker of the Assembly.  Jeff Hughes maintains an

9    office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

10    30.    Claudia L. Mercado is a Public Board Member of the California State Board of

11    Pharmacy. Claudia L. Mercado was appointed by the California Speaker of the Assembly.

12    Claudia L. Mercado maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento

13    California 95833.

14    31.    Jason Newell is a Public Board Member of the California State Board of Pharmacy.

15    Jason Newell was appointed by the California Speaker of the Assembly.  Jason Newell maintains

16    an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

17    32.    Ricardo Sanchez is a Public Board Member of the California State Board of

18    Pharmacy. Ricardo Sanchez was appointed by the California Speaker of the Assembly.  Ricardo

19    Sanchez maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

20                    **THE UNCONSTITUTIONAL REGULATIONS**

21    33.    The challenged Regulations require compounding pharmacies to identify the name

22    of the "manufacturer . . . for each component" on the "compounding record" and ensure that

23    "[w]hen the [Certificate of Analysis ("COA")] is received from a supplier, it must provide the

24    name and address of the manufacturer." *See* Ex. A (highlighting relevant excerpts at 16 CCR

25    §§ 1735.7(c)(1), 1736.9(d), 1736.11(c)(2), 1738.9(b)(2),1738.11(b)).

26    34.    As applied to PCCA, these Regulations create an impossible constitutional

27    dilemma. PCCA is a manufacturer under both California and federal law and reasonably believes

28    it is "the manufacturer" of the products it sells. Yet the Board interprets the Regulations as

1   compelling PCCA to designate another entity—its Upstream Source—as "the manufacturer" on

2   COAs and compounding records, and has made clear that it will only accept PCCA COAs that

3   identify an Upstream Source as "the manufacturer." This compelled designation forces PCCA to

4   communicate to compounding pharmacies that another entity, and that entity alone, is "the

5   manufacturer"—a characterization PCCA believes is false, misleading, and factually controversial

6   because it misidentifies the party responsible for the pharmaceutical ingredients PCCA sells and

7   incorrectly suggests that PCCA is not itself a manufacturer. PCCA is not claiming it cannot also

8   note its own manufacturer status; rather, the constitutional harm lies in being compelled to

9   affirmatively designate a different entity as "the manufacturer"—a singular designation that PCCA

10  believes to be inaccurate and misleading. Moreover, if PCCA's COAs and its customers'

11  compounding records do not satisfy the Board's interpretation of the Regulations, PCCA and its

12  customers will be subject to fines, penalties, and other enforcement actions from the Board. *See*

13  Cal. Bus. & Prof. Code §§ 4084(a), 4169(a)(3) and (b), 4301(g); Cal. Health & Safety Code

14  §§ 110290 and 111335.  Additionally, if the Board rejects PCCA's COAs and customers'

15  compounding records under the Regulations, the compounding pharmacies that currently purchase

16  ingredients from PCCA will be forced to source their important compound ingredients from other

17  companies, causing PCCA to lose business and market position.

18        35.     The Regulations, as applied, are in conflict with the Constitution of the United

19  States, and are therefore preempted, null and void.  The Regulations' effect, as applied to PCCA,

20  violates the Fifth Amendment. The Regulations effect a regulatory taking by forcing PCCA to

21  disclose trade secrets—its carefully developed Upstream Sources—without just compensation.

22  This disclosure destroys competitive advantages that PCCA has built through more than 40 years

23  of investment in API source due diligence, facility audits, and quality control system. The

24  Regulations' effect has the "character" of total interference with PCCA's confidential business

25  information and trade secrets and results in devastating "economic impact" on PCCA by requiring

26  disclosure of PCCA's confidential business information and trade secrets for which it has a

27  reasonable investment-backed expectation of secrecy.  Unless enjoined, the Regulations will

28  violate PCCA's constitutional rights and inflict irreparable harm on PCCA's business.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

36.     The Regulations, as applied, also violate the First Amendment because they restrict truthful speech and compel false speech of private actors.  First, the Regulations restrict PCCA's truthful speech by prohibiting it from accurately identifying itself as "the manufacturer" of the pharmaceutical ingredients it tests, repackages, stores, sells, and distributes. Second, the Regulations simultaneously compel PCCA to make false statements by requiring it to identify entities other than itself as "the manufacturer" responsible for its products, which PCCA believes is not only false, but also misleading, inaccurate and dangerous to the public interest.

37.     The Regulations serve no legitimate public health purpose. Forcing PCCA to affix false, misleading or controversial information on its COA and other ingredient labeling does not serve the public. Further, PCCA is a manufacturer, under California and federal law, and the manufacturer responsible for recalls and adverse events related to products it sells to customers. The Regulations, as applied, only serve to destroy PCCA's trade secrets and compel PCCA to make false and factually controversial statements, which misleads rather than serves the public interest.

38.     Perversely, unless enjoined, the Board's decision to enforce the Regulations against PCCA will harm the residents of the State of California.  PCCA's active pharmaceutical ingredients and other drug ingredients are considered to meet the highest standards in the industry. PCCA's rigorous due diligence into its global Upstream Sources and the in-depth testing PCCA itself conducts on ingredients obtained from those global Upstream Sources prior to relabeling and repacking sets it apart in the industry.  As one compounding pharmacy informed the Board, "PCCA has a rigorous process to vet manufacturers, including that they are registered with and inspected by the U.S. Food and Drug Administration ('FDA'). Further, they have a process of validating their wholesaler's COAs and rejecting components that don't meet standards (even if the wholesaler's COA says its does)."  When a compounding pharmacy receives a PCCA-labeled ingredient, it comes with the comfort and security of knowing that the ingredient used in a patient's compounded drug is of the highest quality. By deeming these COAs and the compounding records not compliant with the Regulations, the Board will force compounding pharmacies serving California residents to purchase ingredients from other suppliers that might

1  not undergo such rigorous testing and extensive due diligence.  This, in turn, will negatively

2  impact patient safety.

3        39.    The Board's stated objective in promulgating the Regulations was to impose the

4  responsibility for monitoring a supplier's FDA compliance on the various compounding

5  pharmacies that purchase from that supplier.  As stated in the Board's response to public

6  comments, each individual compounding pharmacy "needs to have transparency into the supply

7  chain and awareness of the manufacturer (where the manufacturer and vendor are different)," and

8  "to respond appropriately in the event of a product recall."

9        40.    Imposing such a compliance obligation on each compounding pharmacy—many of

10  which are small organizations that are focused on providing necessary medications to their many

11  customers—would not increase safety or reliability, but would unduly burden these businesses

12  with the impossible task of becoming aware of recalls across the globe.  PCCA's Upstream

13  Sources do not possess the name or contact information of PCCA customers that purchase

14  PCCA's APIs or other ingredient components. It is PCCA, not PCCA's customers, that has a

15  contract with the Upstream Source. In the event of a product recall, PCCA's Upstream Sources,

16  some of which are outside the United States, are required to contact PCCA. Only PCCA has both

17  the customer and the Upstream Source information.

18        41.    For example, if PCCA's COA identifies a foreign Upstream Source as "the

19  manufacturer," and PCCA later initiates a recall, California pharmacies will be confused when

20  they receive recall communications from PCCA rather than from the entity identified on their

21  COAs as "the manufacturer." Some pharmacies may delay action while attempting to contact the

22  foreign Upstream Source—an entity with which they have no relationship and over which the

23  Board has no enforcement authority. Meanwhile, the affected product remains in use, extending

24  the public health risk. Had the COA accurately identified PCCA—the entity legally responsible

25  for recalls, subject to the Board's jurisdiction, and maintaining direct relationships with California

26  pharmacies—as "the manufacturer," the recall would proceed immediately without confusion.

27  Thus, the Board's interpretation of the Regulations as requiring false or confusing identification of

28  "the manufacturer" on the COA and labeling would actually **undermine** recall coordination and

1    endanger public safety.

2        42.    PCCA stands in the best position to maintain the reliability and security of its

3    supply chain and to oversee recalls, as necessary, on behalf of its customers. Indeed, forced

4    identification of the Upstream Source as "the manufacturer" on the COAs and other labeling, as

5    the Board's application of the Regulations require, would confuse and misdirect pharmacies away

6    from contacting PCCA (often the sole entity legally responsible for recalls).  In short, the

7    Regulations do not accomplish the Board's stated objectives; instead, the Regulations impose

8    unrealistic burdens on compounding pharmacies and threaten the ability of the supply chain to

9    respond to a recall event.

10                               **JURISDICTION AND VENUE**

11        43.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

12    the action arises under the Constitution and laws of the United States.

13        44.    PCCA has standing to bring this action because the Regulations directly target its

14    manufacturing and speech activities. The Regulations target PCCA's commercial speech and seek

15    to compel disclosure of PCCA's confidential business information and trade secrets. Further,

16    because PCCA is a licensed wholesale distributor, the Board will consider any COA it issues as a

17    "manufacturer" to be false and subject to enforcement action as "unprofessional conduct" under

18    Cal. Bus. & Prof. Code § 4301(g).

19        45.    This Court has authority to grant the requested relief under, *inter alia*, the

20    Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 42 U.S.C. § 1983, because the

21    Regulations infringe upon PCCA's constitutional rights.

22        46.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because at

23    least one defendant in this action resides in this judicial district, and because a substantial part of

24    the events giving rise to PCCA's claims occurred in this judicial district.

25                                **FACTUAL ALLEGATIONS**

26            **PCCA is a Manufacturer and a Supplier of Compound Ingredients**

27        47.    "Compounding is . . . a practice in which a licensed pharmacist . . . combines,

28    mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual

1  patient." *See* Human Drug Compounding, FDA, available at https://www.fda.gov/drugs/guidance-

2  compliance-regulatory-information/human-drug-compounding (last visited September 15, 2025).

3      48.    Compounding serves an important role for patients whose clinical needs cannot be

4  met by commercially available over the counter or prescription drugs.  For example, compounding

5  may be used when a patient is allergic to an ingredient or needs a different drug dosage strength

6  than what is commercially available.  Compounding also allows patients with particular medical

7  needs (*e.g.*, cannot swallow) to receive a drug in a different dosage form so that it can be delivered

8  by alternative methods, such as topical creams, drops, or injections.

9      49.    Without compounded drugs, numerous patients throughout the United States,

10  including in California, would be unable to receive the drugs they need to function, perform

11  routine activities, or, even in some cases, survive.

12      50.    PCCA is not a compounding pharmacy.

13      51.    Rather, PCCA manufactures and supplies bases, APIs and inactive ingredients (also

14  called excipients) to its customers, licensed compounding pharmacies.

15      52.    PCCA's customers (the licensed compounding pharmacies) take the APIs and other

16  ingredient components manufactured by PCCA and place them in a base (capsule, cream, etc.) to

17  create the compounded drug.

18      53.    Under PCCA's Quality Agreements with its Upstream Sources, PCCA is the

19  primary point of contact and bears primary responsibility for coordinating recalls and field alert

20  activities related to the APIs and compounding pharmaceutical ingredient components supplied to

21  customer compounding pharmacies, including those in California. PCCA maintains the

22  traceability records, lot-level distribution data, and customer communications infrastructure

23  necessary to execute recalls efficiently at the pharmacy level.

24      54.    These are activities typically performed by the manufacturer of a drug.

25      55.    While some of PCCA's Upstream Sources are under a legal obligation to conduct

26  recalls, not all of PCCA's Upstream Sources are within the reach of California and federal

27  enforcement where a recall would be deemed legally necessary.

28      56.    Therefore, substitution of the Upstream Source as "the manufacturer" on the COAs

1   and other labeling, as the Board's application of the Regulations require, would confuse and

2   misdirect pharmacies away from contacting PCCA, who is legally responsible to coordinate

3   recalls and may be the sole entity legally responsible for recalls.

4       57.     This will have the effect of delaying communications to PCCA and otherwise

5   complicating recall effectiveness. False or confusing identification of "the manufacturer" on the

6   COA and labeling undermines recall coordination. Such confusion during a medical emergency

7   would not enhance public safety, but instead, undermine it.

8       58.     The FDA does not require PCCA to disclose its Upstream Sources on its COAs and

9   labeling. In 2019, the FDA initiated an enforcement action beginning with a Form FDA-483,

10  "Inspectional Observations," which requested disclosure of PCCA's Upstream Sources on its

11  COAs. PCCA provided a detailed response raising objections that included PCCA's constitutional

12  and trade secret concerns, arguing that FDA did not have the regulatory authority to require and

13  PCCA's compliance methods obviated the need for such disclosure.  In 2023, the FDA closed the

14  enforcement action without requiring any such Upstream Source disclosure, thereby confirming

15  that the FDA accepted PCCA's arguments and alternative approach.

16      59.     Although the Board relies on the FDA, California stands alone in requiring PCCA

17  to disclose upstream ingredient sources on COAs. Neither the FDA nor any other state other than

18  California has determined that such disclosure on a PCCA COA serves public health purposes.

**PCCA's Manufacturing Activities**

19

20      60.     PCCA believes it is the manufacturer of each API and other compound ingredient

21  components it provides to its compounding pharmacy customers.

22      61.     PCCA conducts its own quality control of the materials it packages and provides to

23  compounding pharmacies.

24      62.     PCCA has spent significant resources authenticating, sourcing, and testing its

25  Upstream Sources and their products.

26      63.     PCCA has established standards and procedures through which it conducts due

27  diligence on its Upstream Sources.  Among other things, PCCA requires that its Upstream Sources

28  be inspected by FDA or another recognized authority, or be audited by PCCA or PCCA's third-

1   party auditor.

2       64.    Although PCCA's Upstream Sources provide their own COAs, PCCA does not

3   blindly rely on those COAs before supplying the API to its customers.  Even after PCCA certifies

4   an Upstream Source for purchase, PCCA further vets and authenticates the procured APIs through

5   its own testing.

6       65.    PCCA tests "each unique API and USP verified packaging components . . .

7   manufacturer lot number" procured against set specifications to confirm the ingredient's identity

8   and safety.

9       66.    When a product is found to be unfit for distribution, PCCA rejects the product.

10      67.    If PCCA testing confirms the product is fit for distribution, PCCA communicates

11  its test results on the COA it provides to licensed compounding pharmacies with the APIs and

12  other ingredients.

13      68.    The Board was informed during the Regulations' comment period that "PCCA has

14  a process of validating their wholesaler's COAs and rejecting components that don't meet

15  standards (even if the wholesaler's COA [to PCCA] says it does)."

16                 **PCCA's Upstream Sources Are A Trade Secret**

17      69.    PCCA keeps the Upstream Sources confidential.

18      70.    If the names of the Upstream Sources were known by PCCA's competitors or

19  customers, they would be able to source directly from those suppliers with the knowledge that

20  PCCA has already exhaustively established the quality of their APIs and drug ingredients.

21      71.    Since 1981, PCCA has diligently identified and qualified a critical network of

22  Upstream Sources to ensure the products are from sources that meet PCCA's proprietary quality

23  assessment standards and testing.  PCCA continues to conduct due diligence of these sources to

24  ensure that they consistently provide the highest quality ingredients that satisfy PCCA's testing

25  and analysis.

26      72.    Under California and Federal law, PCCA's list of Upstream Sources that it

27  compiled through extensive due diligence, and which provides PCCA with a competitive

28

1    advantage, is considered a trade secret. Absent PCCA providing the names of its Upstream

2    Sources, such information is not readily available.

3         73.    "[A] trade secret may consist of a compilation of data, public sources or a

4    combination of proprietary and public sources. Expressed differently, a compilation that affords a

5    competitive advantage and is not readily ascertainable falls within the definition of a trade secret."

6    *Logistics Guys Inc. v. Cuevas*, No. 2:23-CV-01592-DAD-CSK, 2024 WL 3011216, at *6 (E.D.

7    Cal. June 13, 2024) (citing *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016)). PCCA's

8    network of over 1,500 Upstream Sources, compiled through more than 40 years of due diligence

9    and quality assessment, qualifies for trade secret protection.

10         74.    Under California law, if the Board compelled PCCA to disclose its Upstream

11    Sources to the Board, the Board would be precluded from further distributing the information or

12    making such information public. For example, under the California Public Records Act, Cal. Gov.

13    Code §§ 6250 et seq., California cannot release certain proprietary information to the public,

14    including corporate records and trade secrets relating to food, drugs, and cosmetics. Cal Gov. Code

15    §§ 6254.15, 6276.44. Notwithstanding that significant swaths of information are available for

16    public disclosure, "corporate proprietary information including trade secrets" is specifically

17    exempt from disclosure by Cal. Gov. Code § 6254.15. Further, the California Health and Safety

18    Code precludes the State from "reveal[ing] . . . any information acquired . . . concerning any

19    method of process which as a trade secret is entitled to protection." Cal. Health & Safety Code

20    § 110165. Notwithstanding California's recognition of the legitimate public interest in protecting

21    trade secrets, the Board's planned enforcement of the Regulations seeks to do what California law

22    prohibits—that is, publicly disclose PCCA's Upstream Sources.

23         75.    Forced disclosure of these trade secrets will destroy PCCA's competitive

24    advantages. Once PCCA's Upstream Source relationships become public through COA and

25    labeling disclosures, several negative repercussions will necessarily occur. Competitors, or even

26    customers, will be able to source directly from PCCA's Upstream Source without investing in

27    their own due diligence. PCCA will lose a competitive advantage it has built up over 40 years in

28    the development of its Upstream Sources. The value of PCCA's quality assurance and supplier

1  expertise will be diminished.  And PCCA's market position and pricing power will be

2  permanently impaired.

3      76.     Defendants have been advised that PCCA's Upstream Source information

4  constitutes trade secrets protected by federal and state law.

5      77.     Defendants' historical practice of *not* publicly releasing the identities of the

6  Upstream Sources that PCCA has disclosed to the Board's investigators confirms that Defendants

7  are aware of the protected status of this information.

8      78.     PCCA has taken necessary steps to protect its trade secrets from disclosure.  This

9  includes asserting its rights to maintain its trade secrets and not releasing protected information to

10  customers, competitors, or the public by making disclosures regulatory bodies, including the FDA

11  and Board investigators.  For example, when investigators for the Board have previously requested

12  that compounding pharmacies disclose PCCA's Upstream Sources, the compounding pharmacies

13  inform PCCA of the request.  PCCA then provides the information directly to the Board

14  investigators under the protection of Federal and California law preventing further disclosure.

15  **PCCA Has No Legal Remedies For The Board's Taking Of Its Property**

16      79.     A property owner whose property has been subject to a taking may seek equitable

17  relief in federal court if the available legal remedies are not "complete, practical and efficient,"

18  including because they would require a repetitive succession of inverse condemnation suits.

19      80.     PCCA does not have an adequate remedy under state law to recover damages for

20  the taking of its trade secrets.  While California common law allows claims for inverse

21  condemnation of intangible property in some circumstances, PCCA is aware of only one case that

22  has suggested in dicta that trade secrets are the type of intangible property that might be

23  compensable by inverse condemnation proceedings. PCCA is not aware of any California decision

24  actually awarding damages in an inverse condemnation proceeding in which a regulatory taking of

25  trade secrets occurred through compelled ongoing disclosure of trade secret information.

26      81.     Defendants have not conceded that PCCA would entitled to assert an inverse

27  condemnation claim under California law. To the contrary, Defendants have contested PCCA's

28  characterization of its Upstream Source information as protectable trade secrets. Defendants have

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

also not agreed that any damages claim PCCA brought in such a proceeding would be free of any "cap" or limit on the amount of compensation that could be awarded.  Thus, at a minimum, PCCA faces a real and substantial risk that any inverse condemnation claim it brought would be challenged on procedural and jurisdictional grounds by the State of California.

82.    Additionally, the Board has also not conceded that California courts have jurisdiction to award damages for harm to PCCA's business relationships and market position outside California.  Thus, even if PCCA could pursue an inverse condemnation claim in California state court, such a proceeding may not adequately compensate PCCA for the loss of its trade secrets outside the State.

83.    Even if an inverse condemnation remedy were conceptually available under California law, it would not be complete, practical, or efficient for at least the following reasons: (1) the irreversibility of the harm caused by the Regulations; (2) the Board relies on an unprecedented and untested theory of California law; (3) the Board's theory requires burdensome and repetitive litigation; (4) the Regulations will inflict takings perpetually in the future; and (5) PCCA would be forced to disclose trade secrets and suffer the harm from that disclosure but wait for potentially years of litigation before recovering damages.

**Irreversibility of Harm**

84.    PCCA's trade secrets, once disclosed, are destroyed permanently and cannot be justly restored through any monetary remedy.

85.    Unlike physical property that can be repurchased or replaced, a trade secret's value depends entirely on its confidentiality.

86.    Once PCCA's Upstream Source relationships are disclosed to California compound pharmacies (and, inevitably, to competitors or the public), no amount of money can restore the confidentiality that gave the information its economic value.

**Unprecedented Legal Theory**

87.    No California court has ever actually awarded inverse condemnation damages for the regulatory taking of trade secrets.

1    88.    PCCA is not aware of any reported California decision addressing whether inverse

2    condemnation is available for intangible property such as trade secrets. This novel and untested

3    legal theory cannot provide PCCA with the "complete, practical, and efficient" remedy required

4    before federal equitable relief may be denied.

5                                    **Repetitive Litigation Required**

6    89.    PCCA sells more than 1,500 different APIs and drug ingredients that are subject to

7    the Regulations.

8    90.    In order to obtain relief for the taking of its property, PCCA would need to bring

9    individual inverse condemnation claims seeking recovery of damages for the disclosure of the

10   Upstream Sources for each of the 1,500 different drugs sold by PCCA.

11   91.    In asserting each of these claims, PCCA would be required to make redundant and

12   repeated showings that:

13               (a) it keeps the Upstream Sources confidential;

14               (b) it derives independent economic value from the confidentiality;

15               (c) it took reasonable measures to maintain secrecy;

16               (d) it engages in due diligence PCCA to identify the Upstream Sources for the drug

17                   at issue;

18               (e) the taking was for "public use";

19               (f) the taking entitled PCCA to compensation under California inverse

20                   condemnation principles; and

21               (g) the specific amount of damages PCCA incurred from the disclosure of each

22                   trade secret.

23   92.    PCCA would need to repeat these showings for each of the 1,500 drugs that PCCA

24   currently sells.

25   93.    An inverse condemnation process requiring PCCA to bring hundreds or thousands

26   of separate claims—or even to aggregate claims and repeatedly return to court as new products are

27   sold and new disclosures occur—is not "complete, practical, and efficient."

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

**Perpetual Future Takings Yielding Endless Litigation**

94. PCCA will continue to identify, develop, and conduct due diligence with new Upstream Sources.

95. As a result of the Regulations, PCCA will continue to face disclosure requirements with each new customer transaction for ingredient components not previously purchased or involving newly approved Upstream Sources.

96. Inverse condemnation can only provide retrospective relief for takings that have already occurred. Such legal proceedings cannot be used to compensate PCCA for the repetitive, ongoing, and future takings that will occur under the Regulations' requirements.

97. PCCA would need to continuously file new inverse condemnation claims as new disclosures occur, creating an endless cycle of litigation.

**Timing of the Harm to PCCA**

98. The Takings Clause requires compensation "at the time of the taking."

99. By the time PCCA could obtain an inverse condemnation judgment—which could take years of litigation through trial and appeals—the harm will have already occurred and be irreversible. PCCA would be forced to continue disclosing its trade secrets throughout the litigation, compounding the harm with each passing day.

100. An after-the-fact damages remedy years later cannot constitute "just compensation" for property that was destroyed at the moment of disclosure.

101. For all these reasons, California's state law remedies are not "complete, practical, and efficient" and PCCA is entitled to seek equitable relief in federal court.

**Regulatory History and Industry Opposition to Regulations**

102. On December 20, 2023, the Board issued a notice of proposed regulatory action regarding changes to Title 16, Division 17 of the California Code of Regulations. Among other articles, the Board proposed revisions to articles 4.5, 4.6, 4.7, and 4.8. *See* Ex. A.

103. Among the proposed revisions, the Board sought to require compounding pharmacies to document "[t]he manufacturer . . . for each component" on a document called the "compounding record." *See id.*

104.    Additionally, the Board proposed revisions requiring compounding pharmacies to ensure the "name and address of the manufacturer" is on "the [Certificate of Analysis]" received with the APIs. ("COA Requirement"). *See id.*

105.    The Board initially stated that this new COA Requirement was warranted "in accordance with the requirements of the FDCA (section 503A(b)(1)(A)(iii)) and further elaborated on in the guidance document - Pharmacy Compounding of Human Drug Products Under Section 503A of the Federal Food, Drug, and Cosmetic Act, issued by the FDA."  Specifically, the Board said that "[o]btaining and retaining this document ensures that the API is coming from an FDA-registered facility, which means the facility has been inspected by the FDA for good manufacturing practices and that the API was manufactured under an appropriate system for managing quality."

106.    On July 31 through August 1, 2024, the Board held a public board meeting. The Board meeting notes reflect the Regulations' "requirement that the COA include the manufacturer's name and address" was raised by those in attendance. The Board minutes state the Board "clarified that this requirement derives from the FDA's guidance about the need to know bulk suppliers."

107.    On November 6 and 7, 2024, the Board held another public board meeting.  Prior to the meeting, the Board gathered and responded to industry and public comments.

108.    Prior to the meeting, the National Community Pharmacists Association ("NCPA") submitted comments relaying concerns regarding the COA Requirement and basis.  The NCPA stated:

> Neither the FDCA nor any FDA implementing regulation—or even a non-binding guidance document—includes a "requirement for the COA" from a supplier to disclose an original manufacturer's identity. The proposed rules point to FDCA to support the proposed rules and yet the FDCA does not support the proposed rules. The FDCA and its implementing regulations set forth a single requirement for COAs: Compounded drugs must be accompanied by valid COAs for their bulk drug substances to qualify for exceptions to the FDCA. 21 U.S.C. §§ 353a(b)(1)(a)(iii), 353b(a)(2)(D) (both requiring compounded drug products to be "accompanied by valid certificates of analysis for each bulk drug substance").

*See* Ex. B at 1 (regarding § 1735.7(c)(2)).

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

109.    The NCPA also raised concerns that the COA Requirement requiring the disclosure of downstream manufacturers would, as applied, require the disclosure of confidential business information and trade secrets. The NCPA stated:

> There are also concerns that the compelled disclosure of original manufacturer . . . information would force revelation of trade secrets. Indeed, for a supplier, the identity of the original manufacturer of API and excipients represents confidential commercial information, and the state cannot compel disclosure of such information. . . . There is no question that the federal government—specifically FDA—considers and understands this information to be confidential and thus treats it as such. In Form FDA 483s and in Warning Letters that FDA posts on its website, FDA redacts the identity of the original manufacturer of API for use in compounding under the federal Freedom of Information Act exemption (b)(4) because it is "confidential commercial information." [citations omitted]

*See id.*

110.    Additionally, prior to the November 2024 Board meeting, A.J. Day, Chief Executive Officer of Wilcrest Pharma and former Vice President of Clinical Services at PCCA, raised concerns that the COA Requirement would, as applied, violate companies "proprietary trade secret information [that California law] protects from disclosure." *See id.* at 2 (regarding § 1735.7(c)(2)).

111.    The staff for the Board responded to the public comments but did not recommend any changes.  In declining to make any changes to the Regulations, the staff stated:

> Staff note that while existing law provides flexibility to record the manufacturer under limited circumstances, continuation of the current provision is not appropriate as it hampers the ability of a facility to respond appropriately in the event of a product recall. . . . Staff note that the Chapter requires either the recording of the manufacturers or vendor; however, in separate guidance issued by the FDA, the facility needs to have transparency into the supply chain and awareness of the manufacturer (where the manufacturer and vendor are different.) The FDA has released guidance in this area, including the importance of a compounders knowing your suppliers - - https://www.fda.gov/drugs/human-drug-compounding/fda-compounders-know-your-bulks-and-excipients-suppliers. Lastly, simply identifying the manufacturer of a component without more does not appear to be requiring the disclosure of a trade secret under Civil Code section 3426.1(d).

*See id* at 1-2.

112.    On January 8, 2025, the Board held a public meeting where concerns regarding the Regulations' COA Requirement were once again raised.  Prior to the meeting, the Alliance for

PHY Compounding submitted their concerns that the Regulations' COA Requirement, as applied, violated trade secret laws, stating in part:

> Additionally, not all wholesalers or repackagers include the original manufacturer name or address on the COA, as they assert that is a trade secret. Trade secrets should be protected under California law. Per the Civil Code, "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process that (1) derives independent economic value, actual or potential, from being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Some pharmacy vendors maintain that the manufacturers they source API from is a trade secret and disclosure would cause economic injury.

*See* Ex. C at 1 (regarding § 1736.9(d)).

113. The response from the Board's staff to the legitimate public objections raised in advance of the January 2025 public meeting mirrored its earlier responses, and again, the Board did not make any changes to the Regulations.

114. On February 5 and 6, 2025, the Board held another public meeting. Prior to the meeting, the Board received additional public comments and concerns regarding the COA Requirement, including multiple comments that the Regulations, as the Board intended to apply them, would violate PCCA's trade secrets.

115. Prior to the February meeting, Marie Cottman, Pharm.D., and owner of Pacific Compounding Pharmacy commented on the COA Requirement as it relates to PCCA. Ms. Cottman stated that the Board's "inspectors are aware that PCCA will not provide original COA nor reveal the manufacturer, except when requested by a Board Inspector." Further, Ms. Cottman stated that "PCCA has a rigorous process to vet manufacturers, including that they are registered with the FDA. Further, they have a process of validating their wholesaler's COAs and rejecting components that don't meet standards (even if the COA says it does)."

116. Additionally, prior to the February meeting, PCCA submitted comments to the Board and raised four primary concerns. *See* Ex. D.

117. First, the Regulations' COA Requirement would, as applied, require the disclosure of PCCA's protected business information and trade secrets. As PCCA stated, the identity of

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

PCCA's Upstream Sources "holds significant value because disclosing the identity of carefully sourced suppliers would grant competitors a substantial and unfair business advantage. PCCA and other similar businesses, have invested heavily in developing relationships with manufacturers, performing rigorous vetting processes, and ensuring compliance with stringent quality standards. Public disclosure of this information would undermine these efforts and expose suppliers' business models to harm." *See id.*

118.    Second, PCCA pointed out that, notwithstanding the Board's asserted purposes, "[n]either the FDCA nor FDA regulations impose any obligation to include the manufacturer's information on a COA. Instead, the FDA has long accepted the practice of suppliers providing COAs that incorporate quality testing data from the suppliers themselves as well as data from the manufacturer's own quality testing." *See id.*

119.    Third, PCCA pointed out that the FDA guidance that the Board referenced was only a recommendation based on Good Manufacturing Practices in compounding ("cGMP") and was not a legal or regulatory requirement in line with actual FDA application and practice. In fact, "the FDA has recognized that requiring manufacturer information is not necessary to meet the requirements of Section 503." *See id.*

120.    Fourth, PCCA informed the Board about the negative impacts resulting from the, as applied, COA Requirement. "Mandating the inclusion of manufacturer information on COAs, as proposed . . . , would impose unnecessary burdens on compounding pharmacies and suppliers alike. The harmful consequences of the proposed regulations include (1) exposing proprietary sourcing strategies—which are considered trade secrets—in violation of California law, and (2) a regulation that diverges from federal standards and guidance, creating unnecessary confusion and inconsistency for suppliers and compounding pharmacies operating across multiple jurisdictions."

121.    Notwithstanding these legitimate and compelling concerns, the Board did not change the proposed COA Requirement language.   The Board staff reiterated the same reasons it had previously advanced for the COA Requirement, and the Board staff added that, "vendors[, like PCCA,] can take steps when contracting with compound [pharmacies] to protect the information related to their business arrangements with manufacturers."  As such, the Board admitted that its

purpose in promulgating the Regulations was *not* to promote transparency as to California residents and patients. At best, the Board's purpose appears to be the forceable disclosure of PCCA trade secrets to its customers and competitors, which still constitutes an unconstitutional taking.

122.    On March 26, 2025, the Board rejected the proposed amendments and objections to the Regulations raised by PCCA and other commentors, and adopted the Regulations.

123.    On June 19, 2025, the Board filed the signed Regulations with the California Secretary of State, and stated that the Regulations would be effective and binding on all regulated pharmacies in California on October 1, 2025.

**The Board Imposes an Unwritten, Vague "Original Manufacturer" Requirement**

124.    The Regulations do not use the term "original manufacturer." Instead, they only refer to "the manufacturer."

125.    PCCA is a manufacturer as that term is used under California law applicable to pharmaceuticals. In California, the definition for "manufacturer" broadly "includes every person who prepares, derives, produces, compounds, or repackages any drug." Cal. Bus. & Prof. Code § 4033.

126.    PCCA meets California's definition of "manufacturer" through multiple manufacturing activities, including:

  (a)    **Deriving** compounding pharmaceutical ingredients from the bulk APIs and other drug products it receives through comprehensive testing, quality control, and certification procedures;

  (b)    **Repackaging** bulk ingredients into smaller quantities suitable for compounding pharmacy use; and

  (c)    **Preparing** pharmaceutical ingredients for distribution through labeling, documentation, and quality assurance processes.

127.    PCCA engages in operations with respect to APIs and other drug ingredients it sells into California such that it qualifies as a "manufacturer" under California and federal law.

128.     PCCA does not just repackage, PCCA engages in several sophisticated and substantial manufacturing processes, including but not limited to: (1) conducting comprehensive testing of all ingredients against established specifications; (2) performing identity verification, purity analysis, and safety testing; (3) issuing COAs based on PCCA's own testing results, not merely wholesale supplier COAs; (4) maintaining direct control over suppliers through periodic facility audits and quality assessments; and (5) rejecting products that fail to meet PCCA's standards, even when wholesale supplier COAs indicate compliance.  These activities fall within the definition of "manufacturer" under both federal and California law.

129.     PCCA is a manufacturer under federal law. PCCA is registered with the FDA as a drug establishment, identifying its business operations as "relabel" and "repack".  FDA regulations state that the definition of "manufacture" includes "manipulation, sampling, testing, or control procedures applied to the final product or to any part of the process, including, for example, analytical testing of drugs for another registered establishment's drug." *See* 21 C.F.R. § 207.1. These activities are also considered part of the actions that constitute "prepares, derives, [and] produces" under California law.  *See* Cal. Bus. & Prof. Code § 4033.

130.     As the term "manufacturer" is commonly used and understood in the regulatory context, the entity in the supply chain that supplies materials to the compounding pharmacies is the manufacturer.

131.     The term "original manufacturer" would be a term with a separate and distinct meaning from "manufacturer," as otherwise the adjective "original" would be unnecessary. In the regulatory context, adjectives are used alongside "manufacturer" to define the type of manufacturer intended, such as "API manufacturer" or "intermediary manufacturer."

132.     Despite the distinction between a "manufacturer" and "original manufacturer," the Board drafted the Regulations to only apply to the "manufacturer."

133.     In other statutes, when California seeks to apply requirements on a specific type of "manufacturer," it does not use the term "manufacturer" alone. Instead, California uses qualifying language to identify the particular type of manufacturer at issue. *See* Cal. Bus. & Prof. Code § 4160(h) (imposing obligations only on an entity with regard to "drugs . . . of its own

1    manufacture"). A representative of the State of California has acknowledged this very distinction

2    in correspondence with PCCA.

3         134.    In contrast, when the term "manufacturer" is used in California statutes and

4    regulations without any such qualifying language, it is understood to apply more broadly in order

5    to capture the entity legally responsible in the supply chain. PCCA is the entity legally

6    responsible for the APIs and other ingredient components it sells to its compound pharmacy

7    customers.

8         135.    The Board has made clear in this litigation that only the "original manufacturer"

9    may be listed on the COAs, despite never including such qualifying language in the Regulations or

10   their definitions.

11        136.    The Board's interpretation would punish PCCA for truthfully stating on its COAs

12   that it is "the manufacturer"; instead, the Board seeks to force PCCA to falsely state that an

13   Upstream Source is "the manufacturer" of a drug **that is manufactured and sold by PCCA**. This

14   perverse result exists entirely because the Board wants regulated entities to disclose their

15   Upstream Sources, but does not want to state this intention clearly in its Regulations.

16        137.    These requirements regarding the "original manufacturer" are not based in the

17   actual language of the Regulations, which only require disclosure of "the manufacturer."

18           **Immediate and Irreparable Harm to PCCA from Disclosure**

19        138.    A trade secret, such as the precise identity of PCCA's Upstream Source for a

20   particular API, is a unique property right in an important way: mere disclosure destroys it. Trade

21   secrets, such as customer and supplier lists, are more fragile than other property rights, such as

22   patents, trademarks or copyright. Absent injunctive relief, there is nothing stopping a defendant

23   from disclosing—and thus destroying—the property right on a whim.

24        139.    The Board has informed PCCA and its customers that it will require the disclosure

25   of PCCA's Upstream Source on the COAs issued by PCCA and will not otherwise accept PCCA

26   as the "manufacturer," even though PCCA is a manufacturer under California and federal law and,

27   consistent with regulatory uses of the term, PCCA believes it is "the manufacturer."

28

140.    Once the Regulations go into effect the Board will train and instruct its inspectors to target PCCA's customers for inspection, and direct them to find violations of the Regulations where COA and compounding records identify PCCA as the "manufacturer."

141.    If the Board and its investigators apply their unwritten interpretation of the Regulations and enforce them as requiring COAs and compounding records to designate PCCA's Upstream Sources as "the manufacturer," then PCCA will suffer price erosion and lose customers, market position, goodwill, brand value, and research and development resources.  The compelled designation of an Upstream Source as "the manufacturer" communicates to pharmacies that a different entity bears responsibility for the products PCCA sells, undermining PCCA's market position and reputation. Indeed, customers have already notified PCCA they will be forced to switch to a PCCA competitor if the Board requires COAs that designate an Upstream Source—rather than PCCA—as "the manufacturer."

142.    PCCA will inevitably suffer damage directly resulting from PCCA's losing valuable trade secrets it has invested in protecting for over 40 years.  Once the Regulations are unlawfully enforced, PCCA will be unable to mitigate or reduce this harm and any potential remedies will be incomplete, impractical, and inefficient.  "A court's order of damages can no more recreate the wealth that has been or will be destroyed [by the Regulations's taking] than it can restore an ancient redwood after the axeman has felled it." *See* Sidak, J. Gregory, "Irreparable Harm from Patent Infringement," The Criterion Journal on Innovation, Vol. 2, 2017.  *See also* Cameron, Dr. Lisa J., "Preliminary Injunctions in Pharmaceutical Litigation," *The Brattle Group*, February 2011; The economic impact of trade secret theft on businesses," *Eureka*, accessed February 9, 2026; Will Courts Still Presume that Plaintiffs in Trade Secret Cases are Likely to Suffer Irreparable Harm?" *Alto Litigation*, August 29, 2025.

### *Irreversible Price Erosion and Market Share Impact*

143.    The Regulations will inevitably and irreparably erode PCCA's sales price and disrupt PCCA's sales process.

144.    PCCA's significant investment in Upstream Sources due diligence sets it apart from its competitors.

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

145.    PCCA's APIs and other ingredients are well-known in the industry to be more expensive than PCCA's competitors.

146.    Notwithstanding the higher sales price, PCCA customers are willing to pay more for PCCA APIs and other ingredients, instead of less expensive APIs and other ingredients from PCCA competitors, because PCCA's customers value providing patients with compound drugs containing the highest-quality APIs and other ingredients vetted by PCCA.

147.    However, the Board's unconstitutional enforcement of the Regulations will destroy PCCA's trade secret and allow customers and competitors to "free-ride" on PCCA's more than 40 years of due diligence and investment, inevitably reducing PCCA's sales and eroding PCCA's sales price. PCCA's loss in market share and market position will be irreversible.

148.    Further irreparable harm will occur in the disruption of PCCA's sales.  Instead of marketing the quality of its APIs and other ingredients known through its substantial due diligence, PCCA sales staff will instead be responding to customers regarding PCCA competitors selling APIs and other ingredients for less money while "free riding" off PCCA's trade secrets. Such disruption in the sales process is irreparable.

149.    Once PCCA's Upstream Source identity is disclosed to a customer or competitor, PCCA's price will not recover to pre-disclosed price levels.  Even if PCCA's price could hypothetically recover (which its cannot), PCCA would nonetheless suffer irreparable damage to its relationship with its customers.

### *Lost Goodwill to PCCA Customers and Market*

150.    The Board's as applied enforcement of the Regulations, will destroy the valuable goodwill PCCA has developed with its customers for over 40 years, for which compensation would be inadequate.

151.    PCCA's invests significant resources in its Upstream Sources due diligence, vetting and testing, which is necessary to ensure patients and the marketplace receive the highest-quality APIs and other ingredients.

152.    The Board's unlawful enforcement of the Regulations will erode PCCA's market position and sales price, and constrain PCCA's cash flow that it uses to conduct due diligence,

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1   vetting, and testing on all the current APIs and other ingredient components it obtains. PCCA is

2   committed to providing the highest-quality APIs and other ingredient components to its customers

3   and (ultimately) their patients.  However, PCCA can only provide the high-quality assurance of its

4   products by conducting its rigorous due diligence, vetting, and testing.

5          153.    Consequently, the Regulations will significantly constrain PCCA's cash flow to the

6   point PCCA will not be able to manufacturer all the APIs and other ingredient components that it

7   currently sells in California and elsewhere.  PCCA will have to choose which APIs and other

8   ingredient components it can still carry, and which APIs and other ingredients it will be forced to

9   discontinue.

10         154.    Because of the Board's unlawful interpretation of the Regulations, PCCA's

11  customers—and ultimately, patients and the marketplace—will be without certain high-quality

12  APIs and other ingredients currently supplied by PCCA. Moreover, PCCA will lose the goodwill

13  it has built up with these stakeholders over many years by suppling such high-quality products.

14  Such an outcome will not only lead to permanent and irreparable harm to PCCA and its customers,

15  but will harm the public interest.

16              *Reduced and Eliminated Research & Development Activities*

17         155.    The public interest is served by research and development ("R&D") in the

18  healthcare industry.  Each year, PCCA invests significant sums of money in R&D that is designed

19  to benefit customers, patients, and the overall public. Such R&D includes research, technology

20  validation, and publication of scholarly work.  PCCA employs a dedicated team of PhD-level

21  scientists, chemists, and pharmacists ("PCCA Science Team") that work to provide the most

22  innovative, effective, and functional products for the compounding industry. To date, PCCA's

23  Science Team has conducted over 220 beyond-use-date formula studies consistent with the United

24  States Pharmacopeia standards. PCCA's Science Team has published over 90 technical reports,

25  over 60 case studies, and over 65 journal articles.

26         156.    The Board's unlawful application of the Regulations will lead to a significant

27  reduction in PCCA's cashflow, and a concurrent reduction in PCCA's investments towards these

28  important R&D activities. If the Board's unlawful interpretation of the Regulations is allowed to

proceed, PCCA sales prices will erode and its cashflow will be reduced. Such a dramatic drop in funding will limit PCCA's ability to retain experienced R&D and quality control personnel, and will lead to the abandonment of R&D activities that benefit customers, patients and the public.

*PCCA's Injury-in-Fact*

157.    Additionally, the Board's unconstitutional enforcement of the Regulations has the potential for it to find PCCA liable for providing noncompliant COAs and labeling. For instance, the Board may allege that PCCA's drugs are "misbranded" because the labeling and COAs identify PCCA (and not the Upstream Source) as the manufacturer.  *See* Cal. Health & Safety Code §§ 110290 and 111335.  Such a finding could subject such drugs to an embargo under Cal. Bus. & Prof. Code § 4084(a), and PCCA itself could be subject to a fine for selling misbranded drugs under Cal. Bus. & Prof. Code § 4169(a)(3) and (b).

158.    Therefore, if the Regulations are enforced as the Board has threatened, PCCA (1) faces immediate and imminent constitutional injury, (2) will suffer immediate, irreparable and permanent harm and damage to its price, market position, reputation, goodwill, brand value, and future R&D resources and activities, and (3) patients in the State of California, who rely upon pharmacies receiving the highest quality ingredients for their compounded drugs, will be harmed.

**CLAIMS FOR RELIEF**

**Count 1**
**For Declaratory Relief And Injunctive Relief**
**Based Upon Violation of The First Amendment – Unlawful Restraint of Speech**

159.    Paragraphs 1 through 158 above are incorporated by reference.

160.    The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The Fourteenth Amendment of the United States Constitution made the First Amendment applicable to the States, including California. *See id.*, amend. XIV.

161.    The First Amendment protects restrictions on speech and provides protections against the government compelling individuals or entities to engage in speech.

162.    Under the First Amendment, laws compelling speech ordinarily receive strict scrutiny. *See Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977).

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1    163.    Laws regulating commercial speech generally receive at least intermediate scrutiny,

2    which prohibits restraints on speech that are not directly and materially advancing the

3    government's interest, or are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v.*

4    *Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

5    164.    Laws that require disclosure of information in connection with commercial

6    transactions are also permissible only if the compelled disclosure is of information that is purely

7    factual, uncontroversially accurate, reasonably related to a substantial government purpose, and

8    not unduly burdensome or chilling. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626,

9    651 (1985).

10    165.    PCCA reasonably believes it is "the manufacturer" of its products, both in fact and

11    under the law.

12    166.    PCCA is responsible for providing the COA to compounding pharmacies

13    purchasing its APIs, including in California.

14    167.    The Regulations, as applied, seek to prohibit PCCA from stating it is "the

15    manufacturer" on its COAs and labeling.

16    168.    The Regulations violate the First Amendment in two distinct but related ways: they

17    restrict PCCA's truthful speech by prohibiting it from accurately identifying itself as "the

18    manufacturer," and they simultaneously compel false speech by requiring PCCA to designate

19    another entity as "the manufacturer" when PCCA is, in fact and law, a manufacturer. This dual

20    violation—both restricting truth and compelling falsehood—cannot survive any level of

21    constitutional scrutiny.

22    169.    The Regulations' use of the definite article "the" before "manufacturer" compounds

23    the constitutional violation by compelling PCCA to designate a single entity as "the manufacturer"

24    when multiple supply chain participants—including PCCA itself—qualify as manufacturers under

25    California law. This compelled designation is not a disclosure of "purely factual and

26    uncontroversial information," but instead requires PCCA to adopt and communicate a disputable

27    legal and factual characterization—specifically, that one particular Upstream Source, rather than

28    PCCA or any other qualifying entity, bears sole manufacturer status. The Regulations thus compel

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1   PCCA to make an inherently contestable statement about a matter on which reasonable minds can

2   and do differ.

3         170.    The practical dangers of this compelled misidentification are not hypothetical. If a

4   quality or safety issue required a recall, a COA identifying the Upstream Source as "the

5   manufacturer" would direct the pharmacy to contact that entity—which may be located overseas,

6   outside FDA jurisdiction, and without a direct customer relationship with the pharmacy—rather

7   than PCCA.  This, despite the fact that PCCA maintains the lot-level distribution records,

8   customer contact information, and recall infrastructure necessary for an effective response. The

9   compelled designation thus not only forces controversial speech but actively undermines the

10  public safety goals the Board purports to advance.

11        171.    Because the Board's application of the Regulations to PCCA would compel speech

12  that is false, misleading, and factually controversial, and because the Board's stated justification is

13  not factually supported and is inconsistent with the public interest, it cannot survive any level of

14  constitutional scrutiny.

15        172.    The Regulations are not narrowly tailored. Less restrictive alternatives exist, such

16  as requiring confidential disclosure to regulators rather than public disclosure to customers.

17        173.    The Regulations are more extensive the necessary. The Regulations go beyond

18  legitimate regulatory needs by forcing the disclosure of trade secrets to third parties.

19        174.    The Regulations, as applied by the Board, subject PCCA to fines, penalties, or

20  other enforcement action if PCCA does not provide false, misleading and factually controversial

21  COAs and labelling to its customers. *See* Cal. Bus. & Prof. Code §§ 4084(a), 4169(a)(3) and (b),

22  4301(g).

23        175.    As a direct and proximate result of Defendants' actions under color of state law,

24  Plaintiff will suffer irreparable harm, thereby entitling PCCA to declaratory and injunctive relief

25  pursuant to 42 U.S.C. § 1983.

26                                  **Count 2**
                        **For Injunctive and Declaratory Relief**
27          **Based Upon the Violation of the Fifth Amendment – Takings Clause**

28        176.    Paragraphs 1 through 175 above are incorporated by reference.

177.    The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment of the United States Constitution made the Fifth Amendment applicable to the States, including California. *See id.*, amend. XIV.

178.    The effect of the Regulations, as applied to PCCA, constitutes a regulatory taking in violation of the Takings Clause of the Fifth Amendment.

179.    The Regulations have the "character" of a total interference with PCCA's property rights in its trade secrets.

180.    Eliminating trade-secret protections for PCCA's confidential list of Upstream Sources will have a significant and devasting "economic impact" on PCCA's market position in California, throughout the United States, and globally.

181.    PCCA invested significant resources to diligently identify and qualify a critical network of Upstream Sources with the reasonable "investment-backed expectation" that its confidential and proprietary information will remain a secret. PCCA investment-backed expectations that its trade secrets would remain confidential is reasonable because (1) California and federal law specifically protects confidential business information and trade secrets, such as PCCA's Upstream Sources, from disclosure; (2) the pharmaceutical industry, including the actions of the Board and the FDA, recognizes relationships as confidential business information; and (3) PCCA invested substantial resources in developing these trusted Upstream Sources with the expectation of maintaining competitive advantages and successfully maintained confidentiality for over 40 years.

182.    The Regulations' mandate that COAs contain the "name and address of the manufacturer," as applied, destroys valuable trade secrets without any compensation, let alone just compensation, constituting an impermissible taking under the Fifth Amendment. U.S. Const. amend. V.

183.    For the reasons set forth above, California's state law inverse condemnation remedy is not "complete, practical, and efficient" for the prospective, repetitive, ongoing regulatory taking at issue here. PCCA therefore is entitled to seek equitable relief in federal court

1    as the only remedy that can prevent the irreversible destruction of PCCA's trade secrets.

2         184.    As a direct and proximate result of Defendants' actions under color of state law,

3    Plaintiff will suffer irreparable harm, thereby entitling PCCA to declaratory and injunctive relief

4    pursuant to 42 U.S.C. § 1983.

5

6    **Count 3**

7    **For Injunctive and Declaratory Relief**
**Based Upon the Violation of the First and Fourteenth Amendment – Vagueness**

8         185.    Paragraphs 1 through 184 above are incorporated by reference

9         186.    The Defendants seek to enforce the Regulations against PCCA by requiring the

10   disclosure of its Upstream Sources by claiming that the Regulations apply only to the "original

11   manufacturer" of the compounded medicine subject to the Regulations.

12        187.    The term "original manufacturer" is not used anywhere in the Regulations.

13        188.    Far from being defined and limited by controlling language, the Defendants make

14   up a requirement that is outside of the plain language of the Regulations and does not exist in the

15   language that applies under the Regulations.

16        189.    Other state and federal regulations do use the term "original manufacturer" to

17   indicate when laws apply only a person meeting a definition of that term.

18        190.    Notwithstanding the absence of the phrase "original manufacturer" in the

19   Regulations, the Board's representatives have stated that only the identification of an "original"

20   manufacturer (Upstream Source) will satisfy these legal requirements.

21        191.    PCCA can be subjected to fines, penalties, or other enforcement action if PCCA

22   fails to meet the unstated and vague requirement to identify the "original" manufacturer. *See* Cal.

23   Bus. & Prof. Code §§ 4084(a), 4169(a)(3) and (b), 4301(g).

24        192.    The Fourteenth Amendment prohibits the enforcement of this type of vague state

25   law.

26        193.    A state law will be void for vagueness if it fails to provide a person of ordinary

27   intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

28   seriously discriminatory enforcement.

1    194.    The Regulations' vagueness is further demonstrated by the Board's use of the

2  definite singular article "the" before "manufacturer." By requiring identification of "the

3  manufacturer" rather than "a manufacturer," the Regulations presuppose that a single,

4  determinable entity holds that status for each API.

5    195.    Yet under California Business and Professions Code section 4033, multiple entities

6  in a pharmaceutical supply chain may simultaneously qualify as "manufacturers." A regulated

7  party cannot determine with certainty which of several qualifying manufacturers the Regulations

8  require to be disclosed.

9    196.    The Regulations provide no guidance for resolving this ambiguity—whether to

10  identify the entity that synthesized the compound, the entity that purified it, the entity that tested it,

11  or the entity (like PCCA) that repackaged, relabeled, and certified it. This ambiguity is not merely

12  theoretical: it is the precise issue that has generated this dispute.

13    197.    PCCA identifies itself as "the manufacturer" based on its reasonable reading of the

14  statutory definition; the Board insists on a different entity. The existence of this genuine dispute

15  over the Regulations' meaning confirms that they fail to provide fair notice of what is required.

16    198.    A person of ordinary intelligence could not read the Regulations and understand

17  that they require the identification of only an "original" manufacturer—as opposed to any entity

18  meeting the statutory definition of "manufacturer" under California Business & Professions Code

19  § 4033—given the term "original manufacturer" is not used in the Regulations.

20    199.    To avoid being "standardless" under the Fourteenth Amendment, a state law must

21  provide objective standards that establish minimal guidelines to govern enforcement of the law.

22    200.    The Defendants' enforcement of a non-existent "original manufacturer"

23  requirement despite the absence of any such language in the Regulations creates a standardless

24  enforcement scheme by which the Defendants are free to enforce the Regulations based on a

25  requirement that does not exist.

26    201.    The Defendants' enforcement of the Regulations as applied to PCCA therefore

27  violates the Fourteenth Amendment's void-for-vagueness rule.

28    202.    In addition to being barred under the Fourteenth Amendment, the vagueness

Barnes &
Thornburg LLP
Attorneys At Law
San Diego

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1    prohibition is strictly enforced in the context of laws that impinge on First Amendment interests.

2        203.    A law that implicates free speech rights will survive a vagueness challenge so long

3    as it is clear what the statute proscribes in the vast majority of its intended applications."

4    *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009).

5        204.    Under the Defendants application of the Regulations, the only context in which it

6    can be enforced is against the "original manufacturer."

7        205.    The Regulations do not state that they apply to the "original manufacturer" and it is

8    not clear that this language applies under the Regulations when they do not use the term.

9        206.    The Defendants' enforcement of the Regulations as applied to PCCA therefore

10   violates the First Amendment's heightened rule for void-for-vagueness.

11       207.    As a direct and proximate result of Defendants' actions under color of state law,

12   Plaintiff will suffer irreparable harm, thereby entitling PCCA to declaratory and injunctive relief

13   pursuant to 42 U.S.C. § 1983.

14                                   **Count 4**
15   **For Declaratory Relief Based Upon the Declaratory Judgment Act**
     **(28 U.S.C. §§ 2201-2202)**

16       208.    Paragraphs 1 through 207 above are incorporated by reference.

17       209.    Under 28 U.S.C. § 2201, in a case of "actual controversy within its jurisdiction,"

18   "any court of the United States . . . may declare the rights and other legal relations of any party

19   seeking such declaration."

20       210.    PCCA brings an actual controversy within the jurisdiction of this Court because it

21   will be injured as a direct result of Defendants' planned enforcement of the Regulations.

22       211.    PCCA is directly subject to, and in fact target of, the Regulations as the entity

23   responsible to identify the "manufacturer" of the ingredients on the COAs and labeling provided

24   to compounding pharmacies.

25       212.    The Regulations became effective October 1, 2025, creating imminent

26   enforcement.

27       213.    The Board and its investigators have made clear it will enforce the Regulations

28   against PCCA by refusing to accept as satisfactory a COA that lists PCCA's name and address as

"the manufacturer."

214.    PCCA faces immediate constitutional injury and business harm.

215.    PCCA has a right not to be subject to government action that is contrary to the law.

216.    The Regulations violate PCCA's rights because they conflict with the United States Constitution.

217.    Therefore, PCCA is entitled to declaratory judgment that the Regulations are contrary to law and cannot be enforced.

218.    A declaratory judgment will provide certainty about the parties' rights and obligations, allowing PCCA to continue its operations without the threat of having its constitutional rights violated or facing regulatory penalties or fines.

219.    PCCA seeks a declaration stating that: (1) PCCA is a "manufacturer" pursuant to the Regulations; (2) PCCA's designation of itself as the manufacturer on the its COAs and labeling would not violate the Regulations; (3) if the Board refuses to allow PCCA to call itself a "manufacturer" under the Regulations, and forces PCCA to identify another party as the "manufacturer" of its products, such application of the Regulations would constitute compelled speech in violation of the First Amendment to the Constitution of the United States; (4) if the Board compels PCCA to disclose the name and address of its Upstream Sources on its COAs, it would effect a regulatory taking without just compensation in violation of the Fifth Amendment to the Constitution of the United States; (5) the planned enforcement of the Regulations by the Board against PCCA and its customers is unconstitutional; and (6) California's inverse condemnation remedy is not complete, practical, and efficient for the type of prospective, repetitive, ongoing regulatory taking at issue, and PCCA is therefore entitled to seek equitable relief in federal court under the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

A.  Issue an order granting permanent injunctive relief in favor of PCCA and against Defendants, such that Defendants are prohibited from enforcing the Regulations in a way that  (1) prohibits PCCA from declaring itself as the manufacturer on PCCA

1    COAs to satisfy the Regulations, (2)  prohibits or penalizes PCCA customers for

2    relying on PCCA-issued COAs and labeling that identify PCCA by name and address

3    as the manufacturer, or (3) requires PCCA to identify its Upstream Source on the

4    COAs PCCA issues;

5    B.  Declare the Regulations, as applied, are unconstitutional and may not be implemented;

6    C.  Declare PCCA's Upstream Sources and other suppliers are confidential trade secrets,

7    the disclosure of which would cause PCCA to lose market position and customers, for

8    which no just compensation exists;

9    D.  Award PCCA its cost and expenses; and

10    E.  Award such further and additional relief as is just and proper.

11

12    Dated:  February 23, 2026            **BARNES & THORNBURG LLP**

13

14                                  By:    _s/ Eric J. Beste_

15                                  Eric J. Beste
                                     Amy C. Poyer

16                                  Mark Crandley (admitted *pro hac vice*)
                                     David A. Frazee (admitted *pro hac vice*)

17                                  Attorneys for the Plaintiff
                                     PROFESSIONAL COMPOUNDING CENTERS

18                                  OF AMERICA, INC.

19

20

21

22

23

24

25

26

27

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF